In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 16-1034

ERIC T. ALSTON,

*Plaintiff-Appellant,*

*v.*

CITY OF MADISON, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 13-cv-635 — **Barbara B. Crabb**, *Judge.*

---

ARGUED FEBRUARY 16, 2017 — DECIDED APRIL 10, 2017

---

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* The Madison Police Department established a focused deterrence program to increase surveillance of repeat violent offenders in Madison. Eric Alston was one of ten repeat violent offenders originally selected for the program.

Alston brought this § 1983 suit against the City of Madison, then Chief of Police Noble Wray, Lieutenant Tom

Woodmansee, and three detectives—Cory Nelson, Samantha D. Kellogg, and Paige Valenta—claiming that he was selected for the program because of his race in violation of his equal-protection rights. Alston also argued that his inclusion in the program deprived him of liberty without due process of law: he contended that he was stigmatized as a repeat violent offender and subjected to increased surveillance, penalties, and reporting requirements, and to a biased probation-revocation hearing examiner.

While in the program, Alston's probation officer Brian Reynolds issued an apprehension request when Alston allegedly failed to attend a scheduled appointment. Alston argued that he rescheduled the appointment before he missed it, so the apprehension request violated his Fourth Amendment rights.

The district court granted the defendants' motion for summary judgment. Because Alston failed to produce evidence that would allow a reasonable trier of fact to conclude that the program had a discriminatory effect or purpose, that Alston's legal rights were altered by being included in the program, and that the apprehension request issued without reasonable suspicion, we reject Alston's arguments.

## I. BACKGROUND

Repeat violent offenders are responsible for a disproportionate percentage of crime in Madison, and the police department expends more resources policing those offenders than others. The department created the Special Investigations Unit to run a focused deterrence program designed to combat that problem. The program used a two-pronged approach: (1) increase surveillance of repeat violent offenders

to deter criminal conduct and (2) provide resources to repeat violent offenders to help them become productive members of society.

If program members continued to reoffend, the department wanted them to be punished to the greatest extent possible. To promote enforcement and punishment, investigations unit detectives[1] met with other law-enforcement agencies to explain the program and to seek the agencies' help implementing it. In particular, the detectives met with probation-revocation hearing examiners and encouraged them to revoke the probation of program members who violated their probation terms.

Not every repeat violent offender in Madison was a part of the program; the aim was to monitor only the worst of that group. The investigations unit relied on two lists to select participants for the program: one from the department of corrections, which identified the most violent offenders released in the last year, and one from the police department technology staff, which identified the most prolific violent offenders in the department's database. From those lists, investigations unit detectives made qualitative and quantitative judgments about potential candidates' criminal history, likelihood of reoffending, effect on the community, and drain on department resources. Detectives chose eighteen candidates and created a candidate profile for each person. Each candidate's profile included the candidate's age, gang membership (if any), a breakdown of prior criminal conduct

---

[1] Defendants Cory Nelson, Samantha D. Kellogg, and Paige Valenta were investigations unit detectives.

(including convictions and charged offenses), and pending cases.

The investigations unit presented the candidate profiles to a selection committee, which chose ten candidates for the program. The department of corrections then sent a letter notifying the selected candidates that they had been chosen for the program. The members were told both in the letter and by their probation officers that they had to attend a notification meeting to learn more about the program.

Alston, who was one of the first ten people chosen for the program, described the program less charitably. He argued that the program was designed to reduce disproportionate minority incarceration in Madison by making examples of minority offenders. He based this conclusion on three pieces of evidence. First, blacks accounted for only 4.5 percent of the Madison population but 37.6 percent of arrests and 86 percent of the program.[2] Second, as to the first ten members chosen, the four candidates associated with allegedly black gangs were selected while the one candidate associated with an allegedly white gang was not. And third, quotes from two high-ranking police-department officials, both involved in establishing the program, revealed that the disparity in minority incarceration was a concern when creating the program. Lieutenant Woodmansee stated that "the goal, truly, was to have a positive impact on disproportionate minority confinement." (R. 113 at 6.) And an investigations unit report credited Chief of Police Noble Wray with describing the

---

[2] Eighty-six percent refers to the racial composition of the program at the time of oral argument: fifty-five of sixty-four program members were black.

program "as a tangible means of addressing racial disparity in the criminal justice system." (R. 111-1 at 34.)

Alston also argued that Reynolds, his probation officer, violated his Fourth Amendment rights. After receiving notice that he had been selected for the program, Alston started having problems with law enforcement. One of Alston's probation conditions required him to attend appointments with Reynolds. On November 16, Alston was not at home for a scheduled visit. Alston alleges that he called Reynolds before he missed the meeting and told Reynolds that he would be late. According to Alston, they rescheduled the appointment for December 2.

Reynolds contends that he did not hear from Alston on November 16. According to Reynolds, Alston did not contact him until November 25. Reynolds claims that Alston's phone died during the November 25 conversation and that Alston did not call him back until November 30. Under Reynolds's version of the story, only then did they reschedule the appointment for December 2.

Regardless of the details surrounding the November 16 meeting, Reynolds issued an apprehension request for Alston on November 23. On December 1, the police department began investigating a domestic battery that allegedly involved Alston.[3] A day later, Alston missed the rescheduled appointment. His next contact with Reynolds or law enforcement was on December 6, when he turned himself into the police because of the domestic-battery investigation.

---

[3] Alston was charged with domestic battery but was acquitted.

After the missed appointments and domestic-battery incident, Alston had a probation-revocation hearing. At the hearing, Alston appeared before his hearing examiner, Beth Whitaker. Whitaker was one of the hearing examiners that investigations unit detectives met with at the start of the program. At those meetings, the detectives encouraged the hearing examiners to revoke the probation of any program member who violated a probation term. Alston asked Whitaker to recuse herself, but she refused. She ultimately revoked Alston's probation, noting that the investigations unit's presentation played at least some role in her decision.

Alston brought a § 1983 suit, claiming that his inclusion in the program violated his equal-protection and due-process rights. Alston also claimed that the apprehension request violated his Fourth Amendment rights. The district court granted the defendants' motion for summary judgment. This appeal followed.

## II. ANALYSIS

We review *de novo* a grant of summary judgment, construing all facts and reasonable inferences in the nonmoving party's favor. *Tapley v. Chambers*, 840 F.3d 370, 376 (7th Cir. 2016). We affirm summary judgment if "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)).

*A. Equal-Protection Claim*

Alston first argues that he was selected for the program because of his race in violation of his equal-protection rights. To prove an equal-protection claim, Alston must show that

the program "had a discriminatory effect" and that the defendants "were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001).

To prove discriminatory effect, Alston must show that he was a member of a protected class and that he was treated differently from a similarly situated member of an unprotected class. *Id.* at 636. He may do so either by statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently from him. *Id.*

Blacks accounted for 4.5 percent of the Madison population, 37.6 percent of arrests, and 86 percent of the program—statistics that Alston repeats time and again in his brief as evidence of discriminatory effect. Even the defendants admit that these statistics are regrettable. (Appellees' Br. at 37.) But that does not mean that the statistics prove discriminatory effect. Statistics are relevant only if they address the pertinent question, that is, whether Alston was treated differently from a similarly situated member of the unprotected class. *Chavez*, 251 F.3d at 638. Alston's statistics do not address whether black, repeat violent offenders were treated differently from white, repeat violent offenders and thus are not evidence of discriminatory effect.

In the absence of sufficient statistics, Alston also attempts to identify a particular similarly situated member of the unprotected class who was treated differently from him. He alleges that, although each candidate's profile did not include race, gang affiliation was used as a proxy for race. This argument addresses the appropriate concern because it compares similarly situated people (repeat violent offenders) of different classes (black versus white). And the candidates

associated with allegedly black gangs were chosen for the program while the one candidate identified with an allegedly white gang was not.

But the argument fails for another reason: Alston never made the racial-proxy argument at the district court. On review of a district court's decision on a motion for summary judgment, we do not consider factual arguments not raised below. *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849 (7th Cir. 2015). "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal *or factual*, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Id.* (quoting *Milligan v. Bd. of Trs. of So. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir. 2012)). Because he did not make the racial-proxy argument at the district court, he cannot do so here. It would be unfair to both the district court and the defendants to conclude that there is a genuine dispute of material fact precluding summary judgment when Alston did not present the district court with the evidence and the defendants were never given a chance to respond. *Id.*

But even if Alston could show a discriminatory effect, his equal-protection claim fails because he cannot show a discriminatory purpose. Discriminatory purpose means more than simple knowledge that a particular outcome is the likely consequence of an action; rather, discriminatory purpose requires a defendant to have selected "a particular course of action at least in part 'because of' … its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)). "Proof of racially discriminatory intent or purpose is required to show a vi-

olation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

Alston first tries to rely on his statistics showing a disparate impact to prove a discriminatory purpose. But disparate impact alone is almost always insufficient to prove discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Without more, a court's acceptance of a disparate-impact argument "would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be." *Id.* at 241 (quoting *Jefferson v. Hackney*, 406 U.S. 535, 548 (1972)). Only in rare cases are statistics alone enough to prove discriminatory purpose. *McCleskey*, 481 U.S. at 293 n.12. And even when equipped with such statistics, a plaintiff must always "point to a defendant's policy or policies causing that disparity." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). The two leading cases for this are *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Gomillion*, the state legislature redrew the city boundary from a square to a twenty-eight-sided figure. Redistricting removed 395 of 400 black voters from city limits while no white voter was affected. *Yick Wo* involved a law that prohibited operating a laundromat in a wooden building without a permit. All but one white applicant received a permit but none of the 200 Chinese applicants did.

"Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266. The statistics must be so stark that they are "unexplainable on grounds other than race," *id.*, leading to the inescapable con-

clusion, "tantamount for all practical purposes to a mathematical demonstration," of discriminatory intent, *Gomillion*, 364 U.S. at 341.

True enough, Alston's statistics show disparate impact: we know that a substantial majority of the program was black. Yet that does not lead to the inescapable conclusion that the defendants acted with discriminatory intent. Consider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities—every minority in *Yick Wo* and all but five minorities in *Gomillion*—were negatively affected by the law. The statistics also revealed that almost no whites—none in *Gomillion* and only one in *Yick Wo*—were negatively affected by the law. In both cases, it was clear that the statistical disparity at issue was caused by the defendants' actions, which allowed the Court to conclude that statistics alone were enough to prove unconstitutional disparate treatment. *See Gomillion*, 364 U.S. at 341; *Yick Wo*, 118 U.S. at 373–74.

Alston's statistics here lack any of those details. There is no evidence about the number of black, repeat violent offenders who qualified for the program but were not chosen. Nor is there any evidence about the number of white, repeat violent offenders chosen compared to the number of white, repeat violent offenders who could have been chosen. Absent more specific statistics, we cannot say that mere disparate impact is sufficient to prove discriminatory purpose.

So Alston had to provide other evidence of discriminatory purpose. As noted above, to show discriminatory purpose, a plaintiff must show that the decisionmaker "selected

or reaffirmed a particular course of action at least in part 'because of' ... its *adverse* effects upon an identifiable group." *Chavez*, 251 F.3d at 645 (quoting *McCleskey*, 481 U.S. at 298) (emphasis added). Here, Alston points to two statements made by men in charge of creating and implementing the program. Neither statement, however, is sufficient. For instance, Lieutenant Woodmansee said that "the goal, truly, was to have a *positive impact* on disproportionate minority confinement." (R. 113 at 6) (emphasis added). While the incarceration rate of minorities might have been part of the reason for adopting the program, Woodmansee's deposition testimony shows the opposite of discriminatory purpose. The testimony demonstrates that the program was created to benefit, not discriminate against, Madison's minority population.

Former Chief of Police Wray's comment does not show a discriminatory purpose for the same reason. That the program was a "tangible means of addressing racial disparity in the criminal justice system" does not show that the department created the program to negatively affect blacks. (R. 111-1 at 34.) Quite the contrary: if the police department wanted to address the disparity in minority incarceration then it did not intend to negatively affect blacks.

For those reasons, Alston has provided no evidence that the program had a discriminatory effect or that the defendants acted with a discriminatory purpose. Thus, the district court appropriately granted the defendants' motion for summary judgment on Alston's equal-protection claim.

*B. Due-Process Claim*

Next, Alston argues that his inclusion in the program deprived him of liberty without due process of law. He claims that being chosen for the group stigmatized him as a repeat violent offender and subjected him to increased reporting requirements, surveillance, and penalties, and to a biased probation-revocation hearing examiner.

"A plaintiff may prove a deprivation of a protected liberty interest by showing damage to his 'good name, reputation, honor, or integrity.'" *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). But not every defamatory statement by a public official constitutes "a deprivation of liberty within the meaning of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 702 (1976). State action that simply harms a plaintiff's reputation is insufficient; the action must also alter a previously recognized legal status or right. *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015). This is known as a "stigma-plus" injury. *Id.* at 768.

Alston can prove the "stigma" portion of the stigma-plus test. The focused deterrence program's entire purpose was to monitor repeat violent offenders. Anyone selected for the program carried that brand. Without question, being classified as a "repeat violent offender" harms one's reputation.

But Alston can get no further because he has not shown that being selected for the program altered a previously recognized legal status or right. Alston's additional reporting requirements amounted to a single event: the notification meeting that he had to attend after he was initially chosen for the program. But a probationer, unlike an ordinary citi-

zen, does not retain the absolute right to come and go as he pleases: a probationer's liberty interest is necessarily limited by special probation conditions. *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). So to prevail on this claim based on his required attendance at the notification meeting, Alston must show that being forced to attend the notification meeting constituted "a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty." *Domka v. Portage Cty., Wis.*, 523 F.3d 776, 781 (7th Cir. 2008) (quoting *Paige v. Hudson*, 341 F.3d 642, 643 (7th Cir. 2003)).

As a probationer with reduced liberty interests, we cannot say that being forced to attend the single notification meeting deprived Alston of his liberty without due process of law. Alston's probation terms make this especially clear. One of the terms required Alston to report to appointments with his probation officer. Although the notification meeting was with the investigations unit detectives and not his probation officer, Alston's probation officer was the one who told him about the meeting and told him that he had to attend it. Given his probation requirement, being forced to attend the notification meeting did not result in a large enough reduction in Alston's liberty to require due process.

Nor did the police department or investigations unit implement the program in a way that altered Alston's previously recognized legal status or rights. The defendants do not dispute that program members were subjected to increased surveillance and increased punishment. Indeed, that was the program's entire purpose. But neither fact altered Alston's legal rights. Alston has provided no evidence that being included in the program authorized the investigations unit to conduct its surveillance in a way that violated his preexisting

rights. The detectives just did what they always had the au-
thority to do: closely monitor Alston's conduct. Likewise, the
increased penalties that the police department wanted en-
forced against program members were penalties already au-
thorized by law. Alston was not threatened with new or in-
creased sentencing ranges. The department always had the
discretion to seek punishment at the strong end of the spec-
trum. *Bryn Mawr Care, Inc. v. Sebelius*, 749 F.3d 592, 602–03
(7th Cir. 2014). It simply chose to exercise that discretion
within the scope of the program.

Finally, Alston's argument about a biased hearing exam-
iner is a nonstarter. A plaintiff cannot recover damages in a
§ 1983 suit if a judgment in the plaintiff's favor would "nec-
essarily imply the invalidity" of a prior conviction. *Heck v.
Humphrey*, 512 U.S. 477, 487 (1994). And a ruling that his
hearing examiner was biased would necessarily imply the
invalidity of the probation-revocation hearing. "A criminal
defendant tried by a partial judge is entitled to have his con-
viction set aside, no matter how strong the evidence against
him." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997) (applying
the principle to a prison disciplinary hearing). The only ap-
propriate way to challenge the validity of a prior conviction
is on collateral review. Alston pursued this argument on col-
lateral review and lost. *Alston v. Smith*, 840 F.3d 363 (7th Cir.
2016).

Despite providing sufficient evidence to conclude that he
was stigmatized, Alston has provided no evidence that being
included in the program altered his previously recognized
legal status or rights. Thus, the district court appropriately
granted the defendants' motion for summary judgment on
Alston's due-process claim.

*C. Fourth Amendment Claim*

Finally, Alston argues that Reynolds violated his Fourth Amendment rights by issuing the apprehension request without a reasonable suspicion that he violated his probation terms. Alston insists that he called Reynolds and rescheduled the November 16 appointment before he missed it and thus did not violate his probation.

When reviewing a grant of summary judgment, we construe all facts and reasonable inferences from the record in the nonmoving party's favor. *Tapley*, 840 F.3d at 376. Yet even at the summary-judgment stage not every purported factual dispute precludes summary judgment. A factual dispute must be material and genuine. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

While the factual dispute here is material, it is not genuine. A probation officer needs only a reasonable suspicion that the probationer violated a probation term to issue an apprehension request. *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). And no reasonable trier of fact could conclude that Reynolds lacked reasonable suspicion that Alston missed the November 16 appointment.

Alston's affidavit forecloses any argument to the contrary. In his response to the defendants' proposed findings of fact, Alston asserted that he remembered "rescheduling the office visit just minutes after missing the November 16, 2011 'home visit'." (R. 71 at ¶ 7.) Alston attempts to evade his admission by arguing that he meant he called Reynolds

"minutes after the home visit was to begin." (Appellant's Br. at 42.) Even so, he was not at home when he was supposed to be for the scheduled appointment. Rather than lacking reasonable suspicion, Reynolds knew with certainty that Alston had violated his probation. Accordingly, the apprehension request was issued with reasonable suspicion and did not violate Alston's Fourth Amendment rights.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of the defendants' motion for summary judgment.