FILED
United States Court of Appeals
Tenth Circuit

June 7, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HOMAIDAN AL-TURKI,

      Plaintiff - Appellant,

v.

ANN TOMSIC, in her official capacity as
Chief Deputy District Attorney; GEORGE
BRAUCHLER, in his official capacity as
District Attorney; JON BIBIK, Special
Agent; ROBERT MOEN, Chief Division
Counsel[*]; PAUL HOLLENBECK; JOHN
DOES 1-10,

      Defendants - Appellees.

No. 18-1226

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-00524-REB-KLM)**
_____

Submitted on the briefs:[**]

Adam Frank, Faisal Salahuddin, Frank & Salahuddin LLC, Denver, Colorado for
Plaintiff-Appellant.

_____

[*] Pursuant to Fed. R. App. 43 (c) (2), Robert Moen replaces Robert Goffi, as a defendant
in this case.

[**] After examining the briefs and appellate record, this panel has determined unanimously
that oral argument would not materially assist in the determination of this appeal. *See*
Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted
without oral argument.

Joseph H. Hunt, Assistant Attorney General, Jason R. Dunn, United States Attorney, Sharon Swingle and Dennis Fan, United States Department of Justice, Washington, D.C., Phil Weiser, Attorney General, James X. Quinn, Senior Assistant Attorney General, Denver, Colorado, and Andrew D. Ringel, Gillian Dale, and Keith M. Goman, Hall & Evans, L.L.C., Denver, Colorado, for Defendants-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Homaidan Al-Turki is a citizen of Saudi Arabia who was sentenced by a Colorado state court to a term of eight years to life. He wishes to serve the remainder of his time in prison in his home country. A treaty permits this, but requires approval of the State, the federal government, and the foreign nation. Plaintiff alleges that he received approval from the proper state official but Defendants (several state and federal officials) then provided false derogatory information to the State that caused it to revoke its approval. He filed suit in the United States District Court for the District of Colorado contending that Defendants had violated his right to procedural due process under the federal Constitution by not providing him a hearing to clear his name before revoking the approval. He is not asking for damages for the violation but seeks an injunction requiring that he be granted a judicial hearing to clear his name and that Defendants not repeat the false allegations against him.

Defendants moved to dismiss the complaint for failure to state a claim, and the district court granted the motion. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The stigma that results from defamation by public officials is alone insufficient to

2

implicate procedural due process; the defamation must also have caused an alteration in the plaintiff's legal status—that is, there must be "stigma plus." But Plaintiff has not adequately alleged a plus factor here, because he suffered no change in legal status as a result of Defendants' alleged stigmatizing comments. Therefore, constitutional due process did not require that he be granted a hearing before the State's final decision against his transfer to a prison in Saudi Arabia.

## I. BACKGROUND

While incarcerated in Colorado, Plaintiff filed an application to transfer to a prison in Saudi Arabia under the Organization of American States' Inter-American Convention on Serving Criminal Sentences Abroad (OAS Convention), an international prison-transfer treaty. Any transfer under the OAS Convention requires the consent of the sentencing nation, the receiving nation, and the prisoner. *See* OAS Convention, Article III § 2, June 9, 1993; 146 Cong. Rec. S10658-02 (Oct. 18, 2000) ("each transfer of a sentenced person under this Convention shall require the concurrence of the sentencing state, the receiving state, and the prisoner"). Under guidelines for an international prison transfer issued by the United States Department of Justice (DOJ), a prisoner in the custody of a State must obtain the State's approval of the transfer. The guidelines state:

> When a foreign national prisoner has been convicted of a criminal violation of a state law and is in state custody, the prisoner must first obtain the approval of the state authorities before he can be considered for transfer by the Federal Government. Each state has its own application process and procedures, which a prisoner must follow. *If a state denies a transfer request, the transfer cannot occur. The Federal Government cannot compel a state to transfer a foreign national.*

3

If the state approves the transfer, it transmits the case to the Department for review. Unless a treaty requirement has not been satisfied or a compelling federal interest is presented by the case, the Department generally defers to a state's transfer decision, believing that the states are best equipped to assess if transfer would be consistent with state policy and the rights of any victims impacted by the crime.

The most common basis for the Department to deny the transfer of a state prisoner typically occurs when a prisoner has not satisfied a treaty requirement. . . . On occasion, the Department may also deny the transfer of a state prisoner based on law enforcement, national security, or public safety concerns.

DOJ, *Guidelines for the Evaluation of Transfer Requests Submitted by Foreign Nationals*, § IV (Aug. 31, 2018) (emphasis added).

Colorado delegates authority for review and state-level approval of transfer applications to the Colorado Department of Corrections (CDOC); and the CDOC executive director and the governor have discretion to approve or deny applications:

The [CDOC] is delegated the authority by the governor of Colorado to approve the transfer of eligible foreign national offenders, pursuant to the conditions of current treaties which provide for such transfer, and the approval of the Department of Justice and the affected foreign country. *Such transfer is a privilege and not a right. The governor of Colorado, or the executive director, at their sole discretion, may approve or deny the transfer of an offender.*

Colo. Dep't of Corr. Admin. Reg. 550-05(IV)(B) (emphasis added). The "Transfer Application Process" section of the CDOC regulation provides that after a prison-transfer application is approved by the executive director, "the [CDOC Office of] Offender Services shall forward a completed application packet to the [DOJ]." The application packet "shall be certified by the central records office." *Id.* at 550-05(IV)(D)(7)(a).

4

According to Plaintiff's complaint, CDOC executive director Tom Clements signed a letter on January 14, 2013, approving his transfer application, but Clements then reversed course and denied the application in March. The complaint alleges the following sequence of events: On the day Plaintiff's transfer was approved, Defendant Ann Tomsic (the prosecutor in Plaintiff's state-court criminal case) contacted Defendant Paul Hollenbeck (the associate director of offender services for the CDOC) and asked if he could delay the transfer decision. About that same time, Defendant Robert Goffi (the FBI chief division counsel) informed Hollenbeck that he had information relevant to the transfer decision. Hollenbeck then delayed transmitting to the DOJ the paperwork approving Plaintiff's transfer at the state level while Tomsic and Hollenbeck coordinated with Defendants Jon Bibik (an FBI special agent) and George Brauchler (a Colorado district attorney) to "stigmatize and defame Plaintiff." Aplt. App. at 520. Plaintiff claims that defamatory comments made by Defendants to executive director Clements caused him to reverse his initial approval of Plaintiff's transfer application.

Relying on the stigma-plus doctrine, the complaint alleges that Defendants conspired to violate Plaintiff's constitutional right to procedural due process by not providing him with a name-clearing hearing to defend himself against the allegedly false accusations before denying his request for a transfer to a Saudi Arabian prison.[1] Defendants moved to dismiss the complaint, and the district court granted their motions,

---

[1] Plaintiff also sued ten John and Jane Doe Defendants, FBI or local law-enforcement agents who allegedly participated in the conspiracy.

holding that Plaintiff had failed to sufficiently allege the plus factor necessary to state a stigma-plus claim.

## II.    DISCUSSION

We review de novo the district court's dismissal of Plaintiff's complaint. *See Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The Fifth Amendment's Due Process Clause forbids the federal government from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause of the Fourteenth Amendment similarly prohibits a State from "depriv[ing] any person of life, liberty, or property, without due process of law." *Id*. amend. XIV, § 1. Court interpretations of one due-process clause generally apply to the other; at the least, "the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth upon their federal counterparts." *Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

"The requirements of procedural due process apply only to the deprivations of interests encompassed by the [constitutional] protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). A constitutionally protected liberty or property interest may be a creation of federal law (including the Constitution itself—at least for liberty interests) or of state law. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself, by reason of guarantees

6

implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies . . . ."); *Roth*, 408 U.S. 577 ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from [a source independent of the Constitution] such as state law . . . .").  Once a protected property or liberty interest is recognized, the Constitution may require certain procedures, such as a hearing, before depriving a person of that interest.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  In considering a procedural-due-process claim we therefore ask two questions:  "(1) Did the plaintiff possess a protected property or liberty interest to which due process protections apply?  And if so, (2) was the plaintiff afforded an appropriate level of process?"  *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016).

Plaintiff contends that he was denied a liberty interest when Defendants' false allegations caused executive director Clements to reverse his initial approval of Plaintiff's transfer to Saudi Arabia for incarceration, and he was therefore entitled to a hearing to clear his name before the reversal.  But Supreme Court and circuit precedent require rejection of this claim.

### A.    No Due-Process Right to Change Place of Incarceration

Before we address Plaintiff's stigma-plus claim, it will be useful to place the claim in context by first discussing the relevant law on whether he would have any due-process rights regarding the location of his confinement if he had not been subjected to defamation.  Plaintiff does not argue that he has a constitutionally protected liberty

7

interest in changing his place of incarceration from Colorado to Saudi Arabia. And for good reason: Supreme Court precedent is squarely to the contrary.

It is settled law that the federal Constitution in itself does not confer a right to incarceration in a particular institution. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976). As the Court explained:

> Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

427 U.S. at 225. The question thus becomes whether *state* law might create a liberty interest in the place of confinement that is protected by constitutional due process.

At one time, the Supreme Court indicated that a State conferred a constitutionally protected liberty interest in favor of prisoners if, and only if, state law "plac[ed] substantive limitations on official discretion." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (internal quotation marks omitted). Two decisions illustrate the standard. In *Meachum*, where an incarcerated plaintiff complained of his transfer to another prison, the Court pointed to the unfettered discretion conferred on state officials making prison-transfer decisions in support of its holding that state law did not create a liberty interest. *See* 427 U.S. at 228 ("Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."); *see also Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) ("Hawaii's prison regulations place no

8

substantive limitations on official discretion and thus create no liberty interest . . . .").[2] The opposite result was reached in *Hewitt v. Helms*, 459 U.S. 460, 471 (1983), where the Court ruled that a prisoner had a liberty interest to remain incarcerated in general population because of "language of an unmistakably mandatory character" in the state's prison procedures. This standard paralleled that for determining whether state law created a constitutionally protected *property* interest. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (property interest is at stake if state law creates a "legitimate claim of entitlement" to a government benefit; but no such entitlement exists "if government officials may grant or deny [the benefit] in their discretion" (internal quotation marks omitted)).

In *Sandin v. Conner*, 515 U.S. 472 (1995), and *Wilkinson*, 545 U.S. 209, however, the Supreme Court adopted a different analytic framework for determining whether a prisoner has a constitutionally protected liberty interest. *Sandin* criticized "the search [undertaken in previous cases] for a negative implication from mandatory language in prisoner regulations." 515 U.S. at 483. It explained that this test had "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges," *id.* at 481, even where that language conferred only trivial rights, *see id.* at 482–83. As a result, the test created "disincentives

---

[2] International prison-transfer treaties, like the one at issue here, have also been held insufficient to create a liberty interest because they lack mandatory language. *See Bagguley v. Bush*, 953 F.2d 660, 662 (D.C. Cir. 1991); *Lopez-Ortiz v. Reno*, No. 94-1460, 1995 WL 364686, at *1 (10th Cir. June 19, 1995) (unpublished).

for States to codify prison management procedures," and it "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* at 482. The Court thus reverted to the principles it saw as underlying its decision in *Meachum*, and held that a State could create a constitutionally protected liberty interest for prisoners only insofar as it freed them from restraints that impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id.* at 484.[3] Applying this test, the Court held that no protected liberty interest was implicated in the plaintiff's 30-day confinement in his prison's Special Housing Unit, even though the applicable prison regulation spoke in mandatory terms. *See id.* at 475–477 & n.3, 487. In contrast, *Wilkinson* held under the same test that prisoner incarceration at an Ohio Supermax facility implicated a liberty interest because of the harshness and duration of the conditions of confinement. *See* 545 U.S. at 224. Although the Court continued to analyze the issue in terms of a "state-created" interest, it did not clarify how a State creates such an interest or what role (if any) the language of state law has in the *Sandin* inquiry. *See id.* at 223–24.[4]

---

[3] Plaintiff, relying on a footnote in *Wolff v. McDonnell*, 418 U.S. 539 (1974), claims that a prisoner has a constitutionally protected liberty interest against "a major change in [his] conditions of confinement." Aplt. Br. at 26 (quoting *Wolff*, 418 U.S. at 571 n.19). But that is not the standard the Court adopted in *Sandin*. *See* 515 U.S. at 484.

[4] At least one opinion representing the views of three Justices suggests that a constitutionally protected liberty interest will still require an entitlement mandated by state law. *See Kerry v. Din*, 135 S. Ct. 2128, 2137 (2015) (plurality opinion) (rejecting interpretation of *Wilkinson* that would require a mere "substantial hope" of a state-conferred privilege to create a liberty interest because "our cases over the past five decades require[] . . . that the privilege be one to which the claimant has been given an entitlement."). Indeed, requiring a prisoner to show both that state law has created an

10

Here, unlike the cases to come before the Supreme Court, Plaintiff is not complaining about being transferred to conditions that he considers unconstitutionally harsh. He is the one seeking the transfer. But the same principles apply. To establish a protected liberty interest in a prison transfer, he must be able to show that keeping him in a Colorado prison subjected him to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. That, of course, he cannot do. While incarcerated in Colorado, he was, as far as the record shows, subjected to merely those "ordinary incidents." *See Meachum*, 427 U.S. at 224 ("Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose.").

### B. Stigma-Plus Doctrine

With this background to inform our analysis, we now turn to the doctrine on which Plaintiff bases his claim. To establish a liberty interest, Plaintiff relies on the alleged defamation of him by Defendants—the stigma they imposed. At several places in his brief, he asserts that one has a liberty interest in his or her reputation. *See, e.g.*, Aplt. Br. at 12 ("Under this Court's stigma-plus precedent, a person has a liberty interest in his good name and reputation."); Aplt. Br. at 14 ("[T]he liberty interest at issue in a stigma-

entitlement through discretion-cabining language and that he meets the *Sandin* test makes good sense. A plaintiff proceeding outside of the prison context must make the former showing; why should not the same be required of a prisoner, whose rights are necessarily limited by his incarceration? *See Wolff*, 418 U.S. at 555 ("Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen . . . ."). Nevertheless, we need not decide this question as Plaintiff clearly lacks a liberty interest in his place of confinement under the *Sandin* standard.

11

plus case is the plaintiff's liberty interest in his good name."); Aplt. Reply Br. at 2 ("[A] stigma-plus plaintiff has a liberty interest in his good name."). But the Supreme Court has explicitly rejected the proposition that "reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul*, 424 U.S. at 701. Not surprisingly, this court's precedents are not to the contrary. *See Martin Marietta*, 810 F.3d at 1184 ("Damage to reputation alone . . . is not sufficient."); *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) ("Damage to one's reputation alone . . . is not enough to implicate due process protections.").

What is needed in addition to stigma, according to the Supreme Court, is some change in legal status. The plaintiff must show that as a result of the defamation, "a right or status previously recognized by state law was distinctly altered or extinguished." *Paul*, 424 U.S. at 711. To merit relief, the change in status must be "significant[]." *Id.* If the plaintiff establishes that the alleged defamation would significantly change the plaintiff's legal status, then the plaintiff is entitled to a name-clearing hearing to prove the falsity of the defamatory information. *See Codd v. Velger*, 429 U.S. 624, 627 (1977) (proper remedy is "an opportunity to refute the charge" (internal quotation marks omitted)); *Nixon v. City and Cty. of Denver*, 784 F.3d 1364, 1368 (10th Cir. 2015) ("Once infringement of a liberty interest is established, the [plaintiff] must show that he was not afforded an adequate name-clearing hearing that comports with the Due Process Clause."); *Ersek v. Township of Springfield*, 102 F.3d 79, 84 (3d Cir. 1996) ("The

12

principal relief to which an individual is entitled should the government's stigmatizing comments rise to the level of a due process violation is a hearing to clear his name.").

Although *Paul* did not explicate what it meant by a legal status that would suffice to create a liberty interest, the opinion did point to prior decisions in which it had recognized a liberty interest when there was defamation plus something more. In *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), "governmental action . . . deprived the individual of a right previously held under state law – the right to purchase or obtain liquor in common with the rest of the citizenry." *Paul*, 424 U.S. at 708. In *United States v. Lovett*, 328 U.S. 303 (1946), a federal statute effectively discharged three federal employees from their federal jobs and prohibited them from obtaining future government employment by forbidding that they be paid salary or compensation. *See Paul*, 424 U.S. at 702. And in *Goss v. Lopez*, 419 U.S. 565 (1975), state action deprived the plaintiffs of the right to attend school. *See Paul*, 424 U.S. at 710.

A later Supreme Court opinion did not provide a more precise test for determining what kind of plus factor is needed to establish a liberty interest, but it indicated the Court's strict view of the limitations of the doctrine. In *Siegert v. Gilley*, 500 U.S. 226, 228 (1991), the plaintiff, a clinical psychologist, agreed to resign from his position at a federal hospital in Washington, D.C., to avoid termination. He then obtained a position at a United States Army hospital in Bremerhaven, West Germany, but during the credentialing process it sought information on his job performance at the D.C. hospital. The response from his former supervisor was very negative, and he was denied credentials. *See id.* The plaintiff was turned down for a position at another Army

hospital and he was later terminated from the Bremerhaven hospital. *See id*. at 228–29. The Court held that he was not deprived of a liberty interest by the allegedly defamatory statement of his supervisor at the D.C. hospital because the statement "was not uttered incident to the termination of [his] employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later." *Id*. at 234. And it was not enough that the statement "would undoubtedly damage the reputation of one in his position, and impair his future employment prospects." *Id*.

Our court has required a plaintiff alleging a stigma-plus claim to show both "that (1) the government made a false statement about [the plaintiff] . . . that was sufficiently derogatory to injure his reputation, and that (2) [the plaintiff] experienced a governmentally imposed burden that significantly altered his status as a matter of state law." *Gwinn*, 354 F.3d at 1224 (remanding for further development of the record) (ellipsis, brackets, and internal quotation marks omitted). We have said that the "plaintiff's alleged reputational damage must be entangled with some other tangible interests such as employment." *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981) (internal quotation marks omitted); *accord Setliff v. Memorial Hosp. of Sheridan Cty.*, 850 F.2d 1384, 1396–97 (10th Cir. 1988) (noting cases in which protected interest recognized when employee demoted or terminated, plaintiff required to withdraw from graduate-study program, and plaintiff excluded from eligibility for Medicaid reimbursements, but holding that subjecting the plaintiff in the case before it to an investigation was not enough to implicate a due-process interest even though it may have damaged his reputation and attractiveness to other employers); *see generally* James L.

14

Buchwalter, *Application of Stigma-Plus Due Process Claims Other than Education Context*, 95 A.L.R. 6th 341 (2014) ("The plaintiff must allege the utterance of a false statement that harms the plaintiff's reputation, along with some tangible and material state-imposed burden in addition to the stigmatizing statement itself.").

Other circuits have similarly required an alteration of a state-recognized right to allege a stigma-plus claim. Two opinions illustrate how the harm suffered by the plaintiff must be to an interest protected by state law. In *Alston v. City of Madison*, 853 F.3d 901, 909 (7th Cir. 2017), the plaintiff alleged that his inclusion in a program to deter certain repeat violent offenders violated his procedural-due-process rights under the stigma-plus doctrine. The Seventh Circuit held that although the program subjected the plaintiff to "increased surveillance and increased punishment" for probation violations, "neither fact altered [the plaintiff's] legal rights." 853 F.3d at 910. Rather, law enforcement "just did what they always had the authority to do"—closely monitor the plaintiff's conduct and exercise their "discretion to seek punishment at the strong end of the spectrum." *Id.* at 910.

In *Behrens v. Regier*, 422 F.3d 1255, 1256 (11th Cir. 2005), the plaintiff alleged that officials from the Florida Department of Children and Families erroneously designated him as a verified child abuser and thereby prevented him from adopting a second child. The Eleventh Circuit held that the plaintiff failed to allege a plus factor giving rise to a procedural-due-process claim because state law "provide[d] that the decision to place a child in a prospective home is a discretionary one," and therefore did not confer any adoption right of which the plaintiff was deprived. *Id.* at 1261. The court

15

also rejected the plaintiff's claim that his previous adoption of another child conferred a "protectable legal status" upon him, as the State had the discretion to reexamine an applicant's qualifications for each prospective adoption. *Id.* at 1262–63.

In this case, Plaintiff has not established the plus factor necessary to create a protected liberty interest. Executive director Clements's letter approving Plaintiff's transfer application conferred no state-recognized right or status upon him. The CDOC regulation is clear: "[T]ransfer is a privilege *and not a right*. The governor of Colorado, or the executive director [of CDOC], *at their sole discretion, may* approve or deny the transfer of an offender." Colo. Dep't of Corr. Admin. Reg. 550-05(IV)(B) (emphasis added). That statement is categorical. Nothing in the regulation prohibits the governor or the executive director from a change of mind after signing the letter. Here the alleged reversal occurred before the DOJ received any approval from the State; but even if approval had already been sent, no provision of the regulation deprives Colorado authorities of discretion to cancel authority at any time before the prisoner is actually removed from the State—either because of the receipt of additional information or simply because of reconsideration. In short, Plaintiff had acquired no "legal status" from the executive director's alleged signature on his letter. The alleged defamatory statements by Defendants that purportedly changed the executive director's decision therefore did not alter Plaintiff's legal status.

Plaintiff contends, however, that despite the language of the regulation granting discretion to the executive director (and the governor), the executive director's signature on the initial approval letter actually did confer on him a legal status—namely, the "status

16

. . . of a prisoner approved for an international transfer at the state level." Aplt. Br. at 23–24. He relies on a portion of the regulation governing the flow of paperwork in the approval process: "Upon approval of the transfer application by the executive director, the Offender Services shall forward a completed application packet to the United States' Department of Justice." Colo. Dep't of Corr. Admin. Reg. 550-05(IV)(D)(7). According to Plaintiff, he "had a right, under the mandatory procedures of CDOC AR 550–05, to have the Office of Offender Services transmit [that] approval letter to the DOJ." Aplt. Br. at 23–24. As we understand Plaintiff's position, once the executive director signed the initial letter, Plaintiff had received "approval" from Colorado for the international transfer, and the executive director and governor lost their discretion to revoke that approval. We are not disposed to interpret a paperwork provision in the "Transfer Application Process" section of the regulation as limiting the substantive power conferred on the executive, and the Colorado authorities obviously interpreted the regulation just as we do.

But even if we were to accept Plaintiff's construction of the regulation, we would still deny his claim. To begin with, we question whether such "state-approval" status is an adequate plus factor. It was hardly the sort of status that one could take to the bank. Plaintiff's future incarceration in Saudi Arabia was still dependent on the favorable exercise of discretion by two other institutions. Before Plaintiff could be transferred there, he not only needed approval by the State of Colorado, but also by Saudi Arabia and by the DOJ, whose decision, like that of Colorado, is discretionary. *See Bagguley*, 953 F.2d at 662; *Lopez-Ortiz*, 1995 WL 364686, at *2. We also note that the executive

17

director's letter denying transfer did not render Plaintiff permanently ineligible for a prison transfer. On the contrary, the letter informed him that if he completed rehabilitative sex-offender treatment, it "could result in [his] eventual parole or transfer to a Saudi Arabian prison." Supp. App. at 121. This does not appear to be the sort of "significant" change required by *Paul*. *See* 424 U.S. at 711. With the approval letter, the transfer to Saudi Arabia was still contingent on discretionary decisions by two other governments. And without the letter, transfer remains a possibility if Plaintiff cooperates.

Moreover, Plaintiff's argument ultimately undermines rather than supports his demand for a name-clearing hearing. If Plaintiff were to prevail on his contention that the executive director's signature on the original letter deprived that official of discretion to change his mind about approval of Plaintiff's transfer to Saudi Arabia, then due process did not require that he be granted a name-clearing hearing before Colorado changed its position. All Plaintiff would need to do is obtain a ruling (perhaps ultimately by a court) adopting his view that the State could not change its position on the transfer. With such a ruling, the truth of the allegations against Plaintiff would become irrelevant—he would receive state approval regardless. Hence, a hearing regarding the truth of the allegations would be pointless. Ironically, to establish that the State's rescission of what he terms its initial approval constituted a change in legal status, Plaintiff argues that the State had no discretion to rescind, thereby rendering it a moot

18

point whether the allegations against him were true.[5] The State's failure to provide him a name-clearing hearing thus did not deprive him of due process. The situation would be similar to that in *Codd*, 429 U.S. at 627–29, where the Supreme Court explained that a name-clearing hearing would be of no use in that case: "[I]f [the plaintiff] does not challenge the substantial truth of the material in question, no hearing would afford a promise of achieving [a favorable] result for him. . . . [The plaintiff] has therefore made out no claim under the Fourteenth Amendment that he was harmed by the denial of a hearing, even were we to accept in its entirety the determination . . . that the creation and disclosure of the file report otherwise amounted to stigmatization."

Finally, we observe that allowing a decision by correctional authorities regarding treatment of a prisoner to satisfy the plus factor would be in tension with the Supreme Court's decision in *Sandin*. To encourage codification of prison policy by prison authorities and to avoid undue judicial interference in correctional matters, the Court in that case, as discussed above, held that constitutional due process would be implicated only if the prison subjected an inmate to restraints that posed an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. But we suspect that almost all adverse decisions by prison authorities with respect to an inmate are predicated on information about the inmate from some source. If a constitutional liberty interest were recognized whenever the communication of that

---

[5] Plaintiff has not argued (and we see no basis for such an argument anyway) that once an initial letter is signed, rescission of approval is permissible only upon a showing that a substantive standard (say, good cause) is met.

information could be characterized as a defamation, courts could well often find themselves back in the business of supervising correctional decisions.[6]

In sum, Plaintiff fails to adequately allege a stigma-plus claim, as he has not shown a significant alteration in a state-recognized legal status or any other government infringement upon his liberty interests.[7]

### III.     CONCLUSION

We **AFFIRM** the district court's dismissal of Plaintiff's action.

---

[6] Plaintiff complained in his reply brief that Defendants' arguments improperly relied on materials outside the complaint. Our opinion, however, does not turn on any factual material outside the scope of a motion to dismiss. In ruling on Defendants' motion to dismiss, we may properly rely on matters that we can judicially notice and materials referenced in Plaintiff's complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider "matters of which [it] may take judicial notice" in ruling on motion to dismiss); *GFF Corp. v. Associate Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (if "document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").

[7] Plaintiff does not contest that if he cannot state a procedural-due-process claim, he necessarily cannot state a claim of conspiracy to violate his due-process rights. *See Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir. 1990) ("[W]e join those courts which have recognized that to recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient.").