IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,897

STATE OF KANSAS,
*Appellee*,

v.

MELVIN LAVON SHIELDS,
*Appellant.*

SYLLABUS BY THE COURT

1.

When a party challenges a district court's failure to give a particular instruction, we review the challenge in three steps. First, we decide whether a failure to preserve the issue or a lack of appellate jurisdiction precludes us from reviewing the challenge at all. Second, we evaluate the merits of the claim to determine whether the district court erred by failing to give the instruction. Third, we determine whether the district court's error warrants reversal.

2.

If a party fails to request an appropriate instruction at trial, the Legislature has instructed us to review only for clear error under K.S.A. 2020 Supp. 22-3414(3). Under that standard, we will reverse a conviction only if the party who failed to request an instruction firmly convinces us that the jury would have reached a different verdict had the district court given the instruction.

3.

A cautionary instruction on eyewitness identifications is legally appropriate when such an identification is "critical" to the State's case and there are serious questions about the reliability of the identification. Critical evidence is not limited to the most damning evidence—it includes any evidence strong enough that its presence could tilt a juror's mind. Courts consider five factors in deciding whether there is a serious question about the reliability of an eyewitness identification: (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the time between the crime and the confrontation.

4.

When reviewing the sufficiency of the evidence supporting a conviction, we review all the evidence in a light most favorable to the prosecution and decide whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve evidentiary conflicts, or make witness-credibility determinations.

5.

A conviction for even the greatest offense can be based entirely on circumstantial evidence so long as the evidence allows a fact-finder to find the elements beyond a reasonable doubt. To be sufficient, the circumstantial evidence need not exclude every other reasonable conclusion.

6.

Premeditation means to have thought the matter over beforehand, and it conveys a time of reflection or deliberation. Premeditation may be established through

2

circumstantial evidence, provided the inferences are reasonable. Premeditation can be inferred from several circumstances, including the nature of the weapon used, the defendant's conduct before and after the killing, and the dealing of lethal blows after the deceased was rendered helpless.

7.

The test to establish whether a pre-charging delay by the federal government violates the right to due process under the Fifth Amendment to the United States Constitution is also used to establish whether a pre-charging delay by the state government violates the right to due process under the Fourteenth Amendment to the United States Constitution:  a defendant must show that the delay caused actual and substantial prejudice and that the government acted in bad faith.

8.

Our review of a district court's denial of a motion to dismiss on due-process grounds is mixed. We exercise unlimited review of the district court's legal conclusions, and we review the district court's factual findings for substantial competent evidence. Substantial competent evidence is legal and relevant evidence that a reasonable person might accept as supporting a conclusion.

9.

We review the admission of relevant photographs for an abuse of discretion. In determining whether the photographs were properly admitted, we first determine whether the photographs are relevant. To be relevant, evidence must be material and probative. Evidence is material when the fact it supports is in dispute or at issue in the case. Evidence is probative if it tends to prove a material fact. Once we determine that the photographs are relevant, we then consider whether the district court nonetheless abused its discretion by admitting the photographs because they are unduly prejudicial. The party

asserting an abuse of discretion bears the burden of showing the error. A district court abuses its discretion when its discretionary decision turns on a legal or factual error or when no reasonable person could agree with the decision.

10.

An instruction on aiding and abetting is factually appropriate if, from the totality of the evidence, the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime. To aid or abet, a person must knowingly associate himself or herself with the unlawful venture and willfully participate in it as he or she would in something he or she wishes to bring about or to make succeed.

11.

We apply a two-step analysis to evaluate claims of prosecutorial error. First, we decide whether the prosecutorial acts fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Second, if the prosecutorial acts fall outside that wide latitude, we reverse unless the State shows beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record.

12.

A single, nonreversible error cannot establish cumulative error.

Appeal from Wyandotte District Court; JENNIFER L. MYERS, judge. Opinion filed June 17, 2022. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Daniel G. Obermeier*, special prosecutor, argued the cause, and *Marc A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: In 1988, two victims were found shot to death in a ditch in Wyandotte County. Investigators developed no solid leads, and the case went cold until DNA testing tied Melvin Shields to the killings 15 years later. Despite the DNA test results, prosecutors declined to file charges for another decade because no murder weapon had been recovered. But the State eventually changed course and charged Shields with two counts of first-degree premeditated murder. A jury convicted Shields on those charges. He now appeals directly to our court to challenge the jury's verdict.

Shields asks us to reverse his convictions based on seven separate claims of trial error. For the most part, Shields' arguments fail to establish error. But the district court did err in one respect: it should have provided a cautionary instruction to the jury on the reliability of eyewitness identifications. Such an instruction was legally and factually appropriate because eyewitness testimony identifying Shields was critical to the State's case and there was a serious question about the reliability of the identification.

Despite this error, we affirm Shields' convictions. Shields did not request the cautionary instruction at trial. Thus, we cannot reverse his convictions unless the failure to give the instruction was clearly erroneous. To establish clear error, Shields must firmly convince us that the jury would have reached a different verdict had the district court given the instruction. But on cross-examination, Shields' trial counsel impeached the credibility of the eyewitness and the reliability of the eyewitness' identification. And during closing argument, Shields' counsel asked the jury to remain mindful of these credibility issues when deciding whether the eyewitness was telling the truth. The reliability of the eyewitness identification was squarely before the jury. And the district court instructed the jury to determine the weight and credit to be given the testimony of

5

each witness. We are not convinced that a cautionary instruction would have changed how the jury resolved that question of fact and, ultimately, its verdict.

FACTS AND PROCEDURAL BACKGROUND

The two victims found shot in Wyandotte County were Steve Ray, a pastor, and J.J., who we refer to by her initials because she was the alleged victim of a sex crime. See Supreme Court Rule 7.043(b)(3) (2022 Kan. S. Ct. R. at 50). They went missing one April afternoon in 1988 in Kansas City, Kansas, after leaving work to meet each other for lunch. Their bodies were found the next day in a ditch on the side of a service road in the Armourdale district of Kansas City. Both had been shot, and J.J.'s pantyhose and underwear were torn, exposing her vagina, which was bruised. The day after the gruesome discovery, J.J.'s car was found abandoned in an alley. Blood samples, cigarette butts, and fingerprints were collected from the car, but the case eventually went cold after investigators developed no leads.

Fourteen years later, a detective reviewing the case ordered DNA testing of the cigarette butts, J.J.'s underwear, and samples collected as part of a sexual examination during J.J.'s autopsy. The results established that Shields was a possible contributor. Shields' fingerprints were also matched to those recovered from J.J.'s car. Even so, the prosecutor responsible for the case declined to charge Shields without first recovering a murder weapon.

More than a decade later in 2016, a different prosecutor decided that the State should pursue the case and charged Shields with two counts of first-degree premeditated murder and, alternatively, two counts of felony murder, which occurs when a person kills someone while committing, trying to commit, or fleeing from certain felonies designated as "inherently dangerous." See K.S.A. 2020 Supp. 21-5402(c). Together with the DNA and fingerprint evidence described above, the State's case at trial depended on the

6

eyewitness testimony of J.J.'s cousin Reginald Reed, who identified Shields as a man he twice saw in J.J.'s car on the day of her disappearance.

Reed testified that he saw Shields and another man cleaning J.J.'s car, which was damaged and muddy, at a carwash on the afternoon she went missing. When Reed asked them where J.J. was, they answered that she was at home. Later that day, after Reed learned that J.J. was missing, he again saw Shields driving J.J.'s car, this time with two other men. When he confronted the men in the car, they sped away and eventually evaded Reed.

Reed's testimony at trial was the first time he had identified Shields as one of the men with J.J.'s car, but it was not the first identification he had made. As part of the initial investigation, Reed had identified a man named Frank Scott as one of the persons he observed in J.J.'s car. At that time, Reed said that Scott was "definitely" the person and that he had "no doubt." During his testimony, Reed defended his identification of Scott because "that was the name that was being tossed around at that time." Then, when detectives reopened the case in 2004, Reed identified a different person from a photo lineup, even though Shields was one of the individuals depicted in the photo array. Shields' trial counsel extensively cross-examined Reed about these prior identifications and repeatedly challenged his credibility and motivations. The reliability of the in-court identification was a central theme of the defense during closing argument.

After the jury convicted Shields of two counts of premeditated first-degree murder, the district court sentenced him to two consecutive sentences of life imprisonment with no possibility of parole for 15 years. Because the district court imposed a sentence of life imprisonment, Shields appealed directly to the Kansas Supreme Court. Jurisdiction is proper. See K.S.A. 2020 Supp. 22-3601(b)(3).

7

Shields raises seven challenges to his convictions. As we explain below, all but one lack merit. We do, however, agree with Shields that the district court should have instructed the jury on eyewitness identifications because the testimony of J.J.'s cousin was central to the case and there was a serious question about the reliability of the identification. But Shields has not firmly convinced us that such an instruction would have affected the jury's verdict, so we hold that the district court's error does not warrant reversal. We address the district court's instructional error first and then explain why Shields' other claims fail to establish district court error.

I.    *The District Court Erred by Not Providing a Cautionary Jury Instruction on Eyewitness Identification, but that Error Does Not Warrant Reversal*

Shields' strongest argument on appeal is that the district court should have given the jury a cautionary instruction on eyewitness identifications based on the testimony of J.J.'s cousin Reed. Such a cautionary instruction is often prudent because although "juries usually attach great weight to eyewitness identification" those in the legal profession know "that such identification is often unreliable." *State v. Hunt*, 275 Kan. 811, 818, 69 P.3d 571 (2003). A properly worded cautionary instruction alleviates some of that concern by providing the jury with factors to consider when evaluating the reliability of an eyewitness identification. See PIK Crim. 4th 51.110 (2020 Supp.) (instructing the jury on six factors affecting reliability).

When a party challenges a district court's failure to give a particular instruction, we review the challenge in three steps. First, we decide whether a failure to preserve the issue or a lack of appellate jurisdiction precludes us from reviewing the challenge at all. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Parties generally cannot raise issues for the first time on appeal, and Shields concedes he did not ask for a cautionary

instruction at trial. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). But a party may raise a jury-instruction challenge for the first time on appeal under K.S.A. 2020 Supp. 22-3414(3) if the "failure to give an instruction is clearly erroneous." Shields argues that it was, and the State has not disputed his ability to raise that claim for the first time on appeal. Thus, our review is not foreclosed under the first step of the analysis, and we will reach the merits of the instructional challenge.

At step two of our analysis, we evaluate the merits of the claim to determine whether the district court erred by failing to give the instruction. In this step, we examine whether the proposed instruction was both legally and factually appropriate. But we are also mindful that a party is not entitled to any proposed instruction merely because it is legally and factually appropriate. *State v. Wimbley*, 313 Kan. 1029, 1035, 493 P.3d 951 (2021). Thus, if the requested instruction is legally and factually appropriate, we must also determine whether the instructions given by the district court, considered together as a whole, properly and fairly stated the applicable law and were not reasonably likely to mislead the jury. 313 Kan. at 1035. If so, the district court's failure to give the requested instruction does not constitute error. See *State v. Potts*, 304 Kan. 687, 703-04, 374 P.3d 639 (2016) (failure to give requested instruction that was legally proper did not constitute error where instructions clearly conveyed the law to the jury). Our review at this step is unlimited, meaning we need not defer to any conclusions that the district court made about the propriety of the instruction. *Holley*, 313 Kan. at 254. If we conclude that the district court did err, then we move to step three.

At step three, we determine whether the district court's error warrants reversal. If the party failed to request an otherwise appropriate instruction at trial, as Shields did, the Legislature has instructed us to review only for clear error. See K.S.A. 2020 Supp. 22-3414(3) (providing that "[n]o party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires" or "unless . . . the

9

failure to give an instruction is clearly erroneous"). Under that standard, we will reverse a conviction only if the party firmly convinces us that the jury would have reached a different verdict had the district court given the instruction. See *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). "The defendant bears the burden of establishing clear error under K.S.A. 22-3414(3)." *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013).

Step three dictates the outcome of this issue. As we explain below, we agree with Shields that a cautionary instruction on eyewitness identifications was both legally and factually appropriate. But Shields has not firmly convinced us that the jury would have reached a different verdict had the district court given a cautionary instruction.

A. *The Cautionary Instruction on Eyewitness Identification Was Legally Appropriate*

A district court must provide a cautionary instruction on eyewitness identifications when such an identification is "critical" to the State's case and there are serious questions about the reliability of the identification. *State v. Anderson*, 294 Kan. 450, 458, 276 P.3d 200 (2012); see *State v. Thurber*, 308 Kan. 140, 198, 420 P.3d 389 (2018). Shields argues that Reed's testimony identifying him as the person Reed saw in J.J.'s car on the day of her disappearance in April 1988 was both critical to the case and unreliable. The State insists that Reed's identification of Shields was not critical to the case because the DNA and fingerprint evidence was much more damning.

The cautionary instruction was legally appropriate. First, Reed's eyewitness testimony was critical to the State's case. In reaching this conclusion, we reject the State's narrow interpretation of the word "critical." That the forensic evidence strongly suggested Shields' involvement in the murders does not preclude other evidence from being critical to the State's case. Critical evidence is evidence strong enough that its presence could tilt

a juror's mind. See Black's Law Dictionary 699 (11th ed. 2019) (defining critical evidence). And we have no difficulty concluding that Reed's identification of Shields could tilt a juror's mind. Cf. *State v. Edwards*, 252 Kan. 860, 868, 852 P.2d 98 (1993) (eyewitness testimony that defendant yelled at victim and fired multiple .38 caliber shots at the victim at close range sufficient to support conviction for second-degree murder). The identification tied Shields to J.J.'s car on the day she went missing, which was essential to establishing Shields' involvement in the murders. It also reinforced the findings from the forensic evidence implicating Shields. Thus, Reed's eyewitness identification was critical to the State's case.

Second, Shields raised serious questions about the reliability of Reed's identification of Shields at trial. In deciding whether defendant has raised serious questions about the reliability of such an identification, courts often consider the five factors articulated in *State v. Duong*, 292 Kan. 824, 836, 257 P.3d 309 (2011):

> "'(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal[,] (4) the level of certainty demonstrated by the witness at the confrontation[,] and (5) the length of time between the crime and the confrontation.'"

Shields developed evidence supporting several of these factors. Reed was the only eyewitness to identify Shields as the person driving J.J.'s car on the day she disappeared. But Reed identified a different man in a lineup in 1988. In fact, Reed testified that he had picked that person from the lineup because that person's name "was being tossed around at that time." Reed then identified yet another man from a 2004 photo lineup that included Shields. So Reed's in-court identification, 31 years after the night the victims went missing, was the first time he had identified Shields. These circumstances presented a serious question about the reliability of the identification.

11

Because Reed's identification of Shields was critical to the State's case and there was a serious question about its reliability, a cautionary instruction was legally appropriate. We next consider whether the instruction was factually appropriate.

*B. The Cautionary Instruction on Eyewitness Identification Was Factually Appropriate*

The cautionary instruction at issue is provided in the Pattern Instructions Kansas at PIK Crim. 4th 51.110. The instruction lists six factors the jury should consider when weighing the reliability and accuracy of an eyewitness identification:

"1.  The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2.  The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3.  Whether the witness had observed the defendant(s) on earlier occasions;

"4.  Whether a significant amount of time elapsed between the crime charged and any later identification;

"5.  Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6.  Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 4th 51.110 (2020 Supp.).

Shields argues this instruction was factually appropriate because the evidence supported many factors listed in PIK Crim. 4th 51.110. We agree. On the first factor, Reed testified that he saw Shields only twice on the day the victims went missing, that

12

both encounters were brief, and that one took place late at night. On the second factor, when Reed witnessed the men in J.J.'s car the second time, he had learned that she was missing and was trying to confront the men. On the third factor, Reed testified that he did not know Shields. On the fourth factor, approximately 31 years had passed between the day Reed observed the men in J.J.'s car and Reed's in-court identification. And on the fifth factor, Reed had twice identified other men in photo lineups that occurred much closer to the time of the murders. We have no trouble concluding that PIK Crim. 4th 51.110 was factually appropriate to this case.

Because we conclude that a cautionary instruction on eyewitness identification was both legally and factually appropriate, and the instructions given by the district court did not properly and fairly state the applicable law on this subject, we hold that the district court erred by not giving it to the jury. Having found error, we turn to the final step in our analysis and determine whether the district court's error requires reversal.

C. *The District Court's Failure to Give a Cautionary Instruction on Eyewitness Identifications Was Not Clearly Erroneous*

Shields concedes that he failed to preserve this issue by requesting a cautionary instruction at trial. Thus, we apply the clear error standard of review. Under this standard, we will reverse Shields' convictions only if he firmly convinces us that the jury would have reached a different verdict had the district court given the cautionary instruction. See *McLinn*, 307 Kan. at 318.

Shields has not firmly convinced us that the cautionary instruction was outcome determinative. Although a cautionary instruction provides a procedural safeguard against unreliable eyewitness identification, it is not the only safeguard. Other important procedural safeguards include

13

"'the defendant's Sixth Amendment right to confront the eyewitness. . . . Another is the defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments. . . . The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence.'" *State v. Marshall*, 294 Kan. 850, 869, 281 P.3d 1112 (2012) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 246-47, 132 S. Ct. 716, 181 L. Ed. 2d 694 [2012]).

In applying the clear error framework to an omitted cautionary instruction on eyewitness identifications, "the appropriate appellate consideration is whether 'other procedural safeguards mitigated' the deficiency." *Marshall*, 294 Kan. at 868.

Shields and his trial counsel fully used these other procedural safeguards at trial. Shields' trial counsel repeatedly challenged Reed's credibility on cross-examination. He pointed out that Reed had identified two men previously, that 31 years had elapsed between the day J.J. went missing and Reed's in-court identification, and that Reed's second observation of the men occurred at night and through the tinted windows of J.J.'s car. And Shields' counsel prominently highlighted these issues during closing argument.

Trial counsel's cross-examination of Reed and his closing arguments placed the reliability of Reed's identification squarely before the jury. And the trial court instructed the jury to consider and weigh all admitted testimony and to determine the weight and credit to be given the testimony of each witness. See *State v. Todd*, 299 Kan. 263, 272, 323 P.3d 829 (2014) (General instruction on witness credibility, along with other evidence of guilt, ameliorated omission of accomplice witness cautionary instruction.). The trial court also instructed the jury that the burden remained with the State to prove the defendant is guilty beyond reasonable doubt. See *Marshall*, 294 Kan. at 869 (identifying reasonable doubt instruction as procedural safeguard against unreliable identification).

14

Thus, if the jury found Reed's identification unreliable, then a cautionary instruction was unnecessary—the jury would have assigned the identification testimony the weight and credit it deserved in following the jury instructions. And if the jury found Reed's identification credible, we are not firmly convinced the jury would have reached a different verdict had the district court provided the cautionary instruction in PIK Crim. 4th 51.110. Shields invoked the same reliability factors found in PIK Crim. 4th 51.110 through cross-examination of Reed and closing argument. See *Dobbs*, 297 Kan. at 1239-40 (other procedural safeguards of confrontation and effective assistance of counsel sufficiently countered the eyewitness instruction error).

And while Reed's identification was important evidence linking Shields to the crimes, it was not the only evidence. Forensic evidence, including DNA test results and fingerprint analysis, implicated Shields. See *Marshall*, 294 Kan. at 870 (noting State's strongest evidence was witness' identification of defendant, but other circumstantial evidence linked defendant to crime, mitigating impact of instructional error).

Considering the instruction error in light of the entire record, we hold that Shields has not carried his burden to prove clear error. Having determined that the district court's instructional error does not warrant reversal, we now turn to Shield's remaining issues.

II. *Shields' Other Issues Fail to Establish Error*

Besides the eyewitness instruction issue, Shields challenges his convictions on six other grounds. First, Shields argues his convictions are not supported by sufficient evidence. Second, he argues the 13-year delay between the DNA testing and the State's decision to charge him violated his federal constitutional rights. Third, he argues the district court abused its discretion by admitting photos of J.J.'s autopsy and photos of the

15

victims before their deaths. Fourth, he argues the district court should not have given an aiding-and-abetting instruction. Fifth, he argues the prosecutor erred during closing argument. And sixth, he argues the cumulative effect of several errors warrants reversal.

### A. Sufficient Evidence Supports Shields' Convictions for Premeditated First-Degree Murder

Shields first argues the evidence is insufficient to support his convictions. When reviewing the sufficiency of the evidence, we decide whether, after reviewing all the evidence in a light most favorable to the prosecution, we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve evidentiary conflicts, or make witness-credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The jury convicted Shields of two counts of premeditated first-degree murder. The district court instructed the jury that to find Shields guilty of each count, it had to find that the State had proved each of these four elements beyond a reasonable doubt:

1. That Shields, or another for whose conduct he is criminally responsible, intentionally killed each victim;
2. That the killing was done maliciously;
3. That the killing was done deliberately and with premeditation; and
4. That the act occurred on or about April 27, 1988, in Wyandotte County.

Shields contends the State presented insufficient evidence that he killed either victim or that any killing was premeditated. The State responds that it presented sufficient circumstantial evidence to establish both of those elements.

16

"Circumstantial evidence" is evidence that allows a person to reasonably infer the existence or non-existence of some other fact. See Black's Law Dictionary 698 (11th ed. 2019) (defining circumstantial evidence as "[e]vidence based on inference and not on personal knowledge or observation"). A conviction for even the greatest offense can be based entirely on circumstantial evidence so long as the evidence allows a fact-finder to find the elements beyond a reasonable doubt. To be sufficient, the circumstantial evidence need not exclude *every* other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Circumstantial evidence supports the jury's finding that Shields killed J.J. and Ray. The State's evidence showed that the victims were together on an early afternoon in April 1988 and went missing; that a few hours later, J.J.'s cousin witnessed Shields and another person cleaning J.J.'s damaged car at a carwash; that Reed witnessed Shields driving J.J.'s car with another man later that night, and that Shields sped away when confronted; that the victims were found murdered the next day; that Shields' semen was found on J.J.'s underwear and that she had injuries consistent with rape; that Shields' fingerprints were found in J.J.'s car; that Shields' DNA was found on a cigarette butt in J.J.'s car; and that J.J.'s and Ray's blood was found inside the car. When that circumstantial evidence is considered in the light most favorable to the State, as our standard of review requires, a jury could have concluded beyond a reasonable doubt that Shields killed J.J. and Ray.

The State argued at trial that Shields himself killed J.J. and Ray. But, in the alternative, it also argued that Shields aided or abetted others in the commission of these murders. The jury's verdict does not specify whether it found Shields guilty as the principal or under an aiding-or-abetting theory. Under the latter theory of liability, a person can be criminally responsible for crimes committed by another person. See K.S.A. 2020 Supp. 21-5210(a). To aid or abet, a person "'must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something

he wishes to bring about or to make succeed.'" *State v. Llamas*, 298 Kan. 246, 253, 311 P.3d 399 (2013). Based on the circumstantial evidence presented at trial, we hold that a jury could have also concluded beyond a reasonable doubt that Shields aided or abetted another person in killing the victims. The blood of both victims was found in J.J.'s car. Reed's testimony places Shields and another man at a carwash cleaning J.J.'s vehicle shortly after she disappeared. His testimony also places Shields with other people in J.J.'s car the night she disappeared; Shields sped off when confronted. Finally, DNA evidence from the cigarette butts in the car belonged to Shields and another person. In the end, the State's evidence was sufficient to support the jury's verdict on both theories of liability.

Likewise, the evidence is sufficient to support the jury's finding that the killings were premeditated. Premeditation means to have thought the matter over beforehand, and it conveys a time of reflection or deliberation. *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). It too may be established through circumstantial evidence, provided the inferences are reasonable. 299 Kan. at 467. Some factors that courts consider when determining whether premeditation can be inferred from circumstantial evidence include the nature of the weapon used, the defendant's conduct before and after the killing, and the dealing of lethal blows after the deceased was rendered helpless. 299 Kan. at 467.

Those factors support an inference of premeditation here. The State presented evidence that a firearm was used to kill the victims, that J.J. was shot execution style in the back of the head, and that Ray was shot at least three times, including a fatal shot to the head. See *State v. Killings*, 301 Kan. 214, 224, 340 P.3d 1186 (2015) (holding that firing weapon multiple times supports inference of premeditation). The State also presented evidence that J.J. was raped before being killed and that the victims were robbed, from which a jury could infer that the motive of the killings was to eliminate witnesses to a crime. See *State v. Vasquez*, 287 Kan. 40, 52, 194 P.3d 563 (2008) ("Although motive is not an element of premeditated first-degree murder, evidence of its

18

existence can be highly persuasive circumstantial evidence of guilt."). And the State presented evidence that the victims were killed someplace else and then dumped on the side of the road and dragged into a ditch. See *State v. Hill*, 233 Kan. 648, 653, 664 P.2d 840 (1983) (holding that transporting and disposing of body supports inference of premeditation). Finally, the State presented evidence that Shields was cleaning J.J.'s car, which had been damaged, on the afternoon that she went missing. See *Hill*, 233 Kan. at 653 (holding that cleaning the crime scene supports inference of premeditation). When that circumstantial evidence is considered in the light most favorable to the State—again, as our standard of review requires—a jury could have concluded beyond a reasonable doubt that the killings were premeditated.

> **B. The Prosecution's Pre-Charge Delay Did Not Violate Shields' Due Process Rights Under the United States Constitution**

Shields next argues that the 13-year delay between DNA testing and the State's decision to charge him violated his due-process rights under the Fifth Amendment to the United States Constitution. Before trial, Shields moved the court to dismiss his charges on that theory; the court denied that motion. While Shields raises his claim under the Fifth Amendment's Due Process Clause, that provision applies only to the federal government. See *Al-Turki v. Tomsic*, 926 F.3d 610, 614 (10th Cir. 2019) ("The Fifth Amendment's Due Process Clause forbids the federal government from depriving any person 'of life, liberty, or property, without due process.'"). Shields' challenge is based on state governmental action only. Thus, we construe Shields' challenge under the Fourteenth Amendment's Due Process Clause, which forbids state governments from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1; see also *Al-Turki*, 926 F.3d at 614 (Fifth Amendment Due Process Clause and Fourteenth Amendment Due Process Clause generally provide same protections).

Our review of a district court's denial of a motion to dismiss based on pre-accusation delay is mixed. *State v. Clopton*, 30 Kan. App. 2d 1208, 1211, 57 P.3d 21 (2002). Under that standard, we exercise unlimited review of the district court's legal conclusions and review the district court's factual findings for substantial competent evidence. Substantial competent evidence is legal and relevant evidence that a reasonable person might accept as supporting a conclusion. 30 Kan. App. 2d at 1211.

While the statute of limitations offers defendants the greatest protection against stale criminal charges, due process also requires dismissal based on pre-accusation delay under some circumstances. See *United States v. Marion*, 404 U.S. 307, 322-24, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). To establish such a violation, a defendant must show two things: first, that the delay caused actual and substantial prejudice; and second, that the State acted in bad faith. See 404 U.S. at 322-24; see also *State v. Royal*, 217 Kan. 197, 201, 535 P.2d 413 (1975) (following *Marion*'s two-part test to a challenge to state governmental action).

The district court found that Shields had shown prejudice from the delay, but we have reservations concluding that substantial competent evidence supports this finding. The district court based its decision on the testimony of a private investigator, hired by Shields, who testified that he could not locate the whereabouts or contact information of some potential witnesses. But a defendant must show actual prejudice resulting from the delay. Without establishing what these witnesses might have testified to, the investigator's testimony seemingly established only the mere possibility of prejudice, not actual and substantial prejudice. See *Marion*, 404 U.S. at 325-26 (holding that the mere possibility of prejudice caused by inaccessible witnesses and lost evidence is speculative, not actual, prejudice).

But even if we presume that substantial competent evidence supports the district court finding of prejudice, Shields' claim fails because he has not established that the State acted in bad faith under the second part of the test. See *United States v. Lovasco*, 431 U.S. 783, 790, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977) ("[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim" based on a pre-charging delay.).

We have conducted the bad-faith inquiry in this context by considering whether the State intentionally delayed charging a defendant to gain a tactical advantage. See *State v. Crume*, 271 Kan. 87, 91, 22 P.3d 1057 (2001). Shields has suggested on appeal that our inquiry too narrowly construes the United States Supreme Court's decision in *Marion* by considering only whether the State sought a tactical advantage, and he asks us to instead adopt a test that balances the prejudice to the defendant against the reason for the pre-charging delay. But we reject the invitation to modify the second prong of the test, and we reaffirm that a defendant must show that the State intentionally delayed charging the defendant to gain a tactical advantage or advance some other improper purpose. This holding is consistent with the rule adopted by the majority of federal circuits. See *United States v. Crouch*, 84 F.3d 1497, 1511-12 (5th Cir. 1996) (surveying decisions of the federal Circuit Courts of Appeal).

Here, the district court found that Shields failed to show the State sought to gain a tactical advantage or otherwise acted in bad faith. Indeed, Shields presented no evidence suggesting bad faith on the part of the State. In fact, the record makes clear that the prosecutor who made the initial charging decision did not want to proceed without a murder weapon but that a different prosecutor reviewed the case years later and concluded that it warranted charging. See *Lovasco*, 431 U.S. at 790, 792 (holding that due-process concerns do not "permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment," nor do they

21

require the State to file charges promptly "once [it] has assembled sufficient evidence to prove guilt beyond a reasonable doubt"). The finding of the district court is sound. And this finding adequately supports the district court's ultimate legal conclusion that no due-process violation occurred.

### C. The District Court Did Not Abuse Its Discretion by Admitting Certain Photographs

Shields next challenges the district court's admission of certain photographs into evidence. Shields objected to the introduction of these images at trial, so his challenge is preserved on appeal. See K.S.A. 60-404.

In analyzing Shields' challenge to the admission of this evidence, we first determine whether the photographs are relevant. *State v. Randle*, 311 Kan. 468, 478, 462 P.3d 624 (2020). To be relevant, evidence must be material and probative. Evidence is material when the fact it supports is in dispute or at issue in the case. Evidence is probative if it tends to prove a material fact. *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018).

Once we determine that the photographs are relevant, we then consider whether the district court still abused its discretion by admitting the photographs because they are unduly prejudicial; photographs may be unduly prejudicial when they are too repetitious, gruesome, or inflammatory. *Randle*, 311 Kan. at 478. A district court abuses its discretion when its discretionary decision turns on a legal or factual error or when no reasonable person could agree with the decision. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The party asserting an abuse of discretion—here, Shields—bears the burden of showing the error. *Randle*, 311 Kan. at 478. "In a murder case, admission of photographs has rarely been held to be an abuse of discretion." *State v. Williams*, 308 Kan. 1320, 1334, 429 P.3d 201 (2018). But if error can be established, the party

benefitting from the error must persuade us that there is no reasonable probability that the error affected the outcome of the trial given the entire record. *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018) (applying statutory harmless-error standard to the improper admission of evidence that does not affect substantial rights).

Shields challenges the admission of three sets of photographs at trial. The first set, exhibits 24 through 27, depicts J.J. in the morgue before her autopsy. The second set, exhibits 28 and 29 in the district court, are a close-up of J.J.'s pubic area taken during the examination of her body. Shields argues that these first two sets of photographs were unduly prejudicial because they were repetitious and only helped inflame the passions of the jury. The third set, exhibits 68 and 69, are two family photos taken before the victims were killed. Shields argues that these pictures served no other purpose than to manufacture sympathy for the victims—in other words, the photographs were not relevant and were unduly prejudicial by inflaming the passions of the jury.

The district court's decision to admit these three sets of photographs was not based on a legal or factual error, and we conclude that a reasonable person could agree with the district court ruling. Thus, Shields failed to meet his burden to prove the district court abused its discretion by admitting the photographs. The first set of photographs, exhibits 24 through 27, were relevant because they show the state of J.J.'s clothes after the crime and before the autopsy. The four images depict J.J. and her torn clothing from different angles and perspectives, so they are not unduly repetitive or prejudicial.

The second set, exhibits 28 and 29, were relevant to establishing whether J.J. had been raped. The medical examiner testified that the images showed bruising, and the State had charged Shields with felony murder carried out in the commission of a rape, as an alternative to the first-degree premeditated murder charge. See *State v. Mireles*, 297 Kan. 339, 358-62, 301 P.3d 677 (2013) (holding that photographs that help prove the

elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible). The probative value of these photographs outweighed any undue prejudice.

As for the third set, exhibit 68 is a picture of the victims at church before their deaths. This photograph was relevant because it helped prove the victims' identity and their relationship. Photographs of homicide victims taken while they are still living are admissible to prove identity. *State v. Longoria*, 301 Kan. 489, 517, 343 P.3d 1128 (2015). And "a before-death photograph results in minimal prejudice when, as in this case, the photograph is shown only once and not accompanied by any inflammatory personal details about the victim. Minimal prejudice is not undue prejudice." 301 Kan. at 519. The other picture in the set, exhibit 69, was a recent photograph of J.J. and her baby in front of her car. The photograph was relevant to establishing the condition of J.J.'s car before the crimes—it showed that J.J.'s car was not damaged, which contrasted with the condition of the vehicle when Reed saw it at the carwash. And the image also revealed that the black car bra depicted in the photograph was missing when the car was found after the killings.

Shields fails to show error in connection with the district court's admission of the challenged photographs.

### D. *The District Court Did Not Err by Instructing the Jury on Aiding and Abetting*

Shields next argues that the district court erred by instructing the jury on aiding-or-abetting liability. As we said above, under that theory of liability, a person can be criminally responsible for crimes committed by another person under some circumstances. See K.S.A. 2020 Supp. 21-5210(a). Shields argues that such an instruction was neither legally nor factually appropriate here and that the court's decision to provide the instruction warrants reversal.

We use the same three-step analysis to review this claim that we used in addressing the district court's failure to give a cautionary eyewitness identification instruction. First, we decide whether we can or should review the issue based on preservation or jurisdiction. Second, we decide whether the district court erred by giving the instruction. And third, if the district court did err, we decide whether the error warrants reversal. *Holley*, 313 Kan. at 253.

Shields objected to the aiding-or-abetting instruction at trial. As a result, we review any error here under the harmless-error standard. Under that standard, the State would have to show that there is no reasonable probability that the court's error affected the outcome of the trial. *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 (2012). Though that standard is less stringent than clear error, we do not reach step three because the district court did not err—the aiding-and-abetting instruction was legally and factually appropriate.

Shields contends that the aiding-and-abetting instruction was not legally appropriate because it allowed the jury to find him guilty if either Shields *or* another person for whom he is criminally responsible acted with premeditation. As a result, Shields argues, if the jury found him guilty based on aiding or abetting, then the instruction negated the State's requirement to prove that Shields possessed the necessary premeditation. The verdict form was silent on whether the jury found Shields guilty based on an aiding-or-abetting theory.

We rejected the same challenge in *State v. Betancourt*, 299 Kan. 131, 135-36, 322 P.3d 353 (2014). In that case, which also involved first-degree premeditated murder, we held that the aiding-and-abetting instruction accurately expresses the law on this theory of liability when read along with the elements instruction for first-degree premeditated

25

murder. 299 Kan. at 135-36. Here, as in *Betancourt*, the aiding-and-abetting instruction, was read along with the elements instruction, and it accurately advised the jury on the law, so it was legally appropriate.

Shields also contends the instruction was not factually appropriate. An instruction on aiding and abetting is factually appropriate if, from the totality of the evidence, the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime. *State v. Walker*, 308 Kan. 409, 424, 421 P.3d 700 (2018). To aid or abet, a person "must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed." *Llamas*, 298 Kan. at 253. Shields contends there was no such evidence.

We disagree. As we outlined above, based on the totality of the evidence, a jury could reasonably conclude that Shields aided or abetted another person in the commission of a premeditated first-degree murder. The blood of both victims was found in J.J.'s car. Reed's testimony places Shields and another man at a carwash cleaning J.J.'s vehicle shortly after she disappeared. His testimony also places Shields with one or two other people in J.J.'s car the night she disappeared; Shields sped off when confronted. Finally, DNA evidence from the cigarette butts in the car belonged to Shields and another person. A jury could reasonably conclude from this evidence that Shields did not act alone. As a result, the aiding-and-abetting instruction was factually appropriate. See *State v. Blevins*, 313 Kan. 413, 428-29, 485 P.3d 1175 (2021) (conflicting evidence creating ambiguity as to which party pulled the trigger rendered aiding-and-abetting instruction factually appropriate).

Because the aiding-and-abetting instruction was both factually and legally appropriate, the district court did not err by providing it.

*E.   The Prosecutor Did Not Err During Closing Argument*

Finally, Shields alleges several prosecutorial errors during closing argument. He did not object to the alleged errors at trial, but appellate courts will review a claim of prosecutorial error even without a timely objection. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018).

We apply a two-step analysis to evaluate claims of prosecutorial error. *State v. James*, 309 Kan. 1280, 1306-07, 443 P.3d 1063 (2019). First, we "'decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.'" 309 Kan. at 1306. Some arguments that fall outside that wide latitude are arguments that inflame the passions of the jury, *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018), arguments that focus on justice for the victims, *State v. Holt*, 300 Kan. 985, 996-99, 336 P.3d 312 (2014), arguments that dilute the State's burden of proof, *State v. Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018), and arguments about facts not in evidence, *State v. Barber*, 302 Kan. 367, 382, 353 P.3d 1108 (2015).

Then, if we find that the prosecutor erred, we determine the reversibility of such error under the constitutional harmless-error standard. Under that standard, "'the burden falls on the State to demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict."'" *James*, 309 Kan. at 1307.

Shields raises several challenges to three portions of the State's closing argument. We review each portion below. As we will explain, we find no error.

First, Shields challenges the beginning of the State's closing argument, during which the prosecutor referred to the "arc of justice" in the case and argued that the evidence showed guilt "beyond most doubts any of us could ever conceive":

> "On April 27th, 1988, the lives of [J.J.] and Steve Ray were cut short, not by a car accident, not by some twist of fate, but because Melvin Shields took their lives. His semen, his cigarettes, his fingerprints, his guilt. This case is 31 years in the making. The *arc of justice* in this case is long indeed and it took 31 years from that ditch in Armourdale to get to this courtroom here, but it's here. And this evidence here shows not just beyond any reasonable doubt, but beyond most doubts any of us could ever conceive that Melvin Shields is responsible for the deaths of [J.J.] and Steve Ray." (Emphasis added.)

Shields alleges the prosecutor improperly focused on justice for the victims in referring to the "arc of justice" and diluted the burden of proof by equating the guilty-beyond-a-reasonable-doubt standard to common sense in this portion of closing argument.

We disagree with Shields. By arguing that the "arc of justice" was long in this case, the prosecutor was reasonably referring to the unique timeline of the prosecution. And the prosecutor tied the need for justice to the evidence generally, not to the specific victims. See *State v. Nguyen*, 285 Kan. 418, 425, 172 P.3d 1165 (2007) (stating that it is permissible, if not expected, for a prosecutor to argue for justice in general). Nor did the prosecutor dilute the burden of proof—the prosecutor properly argued that the evidence exceeded the threshold of reasonable doubt. See *State v. Anderson*, 153 Wash. App. 417, 424, 220 P.3d 1273 (2009) (holding that a prosecutor may properly argue that the State has "met and exceeded" its burden of proof).

28

Second, Shields objects to the prosecutor's comments that Reed was "100 percent certain in court, he didn't waiver at all" in identifying Shields as the person driving J.J.'s car, and that Reed was "100 percent sure on that." Shields contends that the prosecutor was providing an opinion about Reed's credibility. We again disagree. The prosecutor offered no opinion about Reed's credibility; instead, he accurately characterized Reed's testimony, which was consistent and unwavering. A prosecutor does not err by accurately summarizing the testimony of a witness.

And third, Shields objects to the prosecutor's comments suggesting that premeditation could be inferred because Ray's body was posed like a crucifix and that the killings were "no accident":

"And you may be thinking, well, this is all just some coincidence. Maybe there's a reasonable explanation for why Melvin Shields' semen is inside of [J.J.]. Ladies and gentlemen, look at State's Exhibit 3. It is a window into 31 years in the past. This video shows you what responding officers saw. It shows you how those bodies were left. It shows you [J.J.] left in the ditch with her knees bent, panties torn, pantyhose torn, her breasts exposed and then next to her, you have Steve Ray. And the way you see him lying out, his arms are out and his feet are crossed. I don't know how many of you have seen a crucifix. I'd suggest to you that looks a lot like a crucifix. Steve Ray was a pastor. What does that tell you? Ladies and gentlemen, I submit to you that tells you that whoever killed Steve Ray and [J.J.] knew at least who he was to leave him like that.

"You see the dirt and the grass on the front side of his person. Was he dragged? . . . I submit to you that the evidence shows that their bodies were left this way on purpose because it was a deliberate, premeditated, malicious killing. Whoever did these killings thought the matter over beforehand. They had formed the plan, the intent, the design to kill. Ladies and gentlemen of the jury, anyone looking at this video can see that this was no accident."

29

Shields challenges two statements in this argument. He first contends the prosecutor's comments about the crucifix inflamed the passions of the jury and made an unreasonable inference that the perpetrators knew Ray based on the positioning of his body. Then Shields argues that the prosecutor's comments about the killings being nonaccidental diluted the burden of proof for premeditation. We again disagree with Shields.

The prosecutor's comments about the crucifix were made to support the State's argument that the killings were intentional and premeditated, not to inflame the passions of the jury. The prosecutor made the challenged remarks while arguing how various pieces of evidence found at the crime scene, coupled with the forensic evidence, demonstrated planning and deliberation on the part of the perpetrators. Specifically, the prosecutor noted that the positioning of Ray's body resembled a crucifix—an observation tied directly to the photographic evidence admitted at trial. And from this fact, the prosecutor argued the jury could infer that the perpetrators may have known Ray's identity as a pastor in the community, lending further support to the State's premeditation argument. At no time did the prosecutor suggest the positioning of Ray's body was evidence of any hate crime or that the killing was motivated by religious animus. Nor does the record support the conclusion that the prosecutor's remarks had such an effect on the jury. Viewed in context, the prosecutor's remarks were closely tied to the admitted evidence and limited substantively to the State's premeditation argument. Thus we conclude the challenged statements fell within the wide latitude prosecutors are afforded in arguing the case.

We also do not believe the prosecutor's inference was unreasonable, even if it was unlikely. The evidence established that Ray was a pastor. The photo of the crime scene admitted at trial showed Ray on his back with his arms outstretched, his legs extended, and his feet crossed—a body position that arguably resembles a crucifix. The prosecutor argued that one could infer, from the positioning of Ray's body and the fact that Ray was

30

a pastor, that the killer knew Ray, which bolstered a finding of premeditation. While the comments might stretch the boundaries of what constitutes a *reasonable* inference from the evidence, it was not an inference founded merely on speculation. And "a prosecutor is permitted to draw reasonable inferences from the evidence and is given latitude in drawing those inferences." *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007). Because the prosecutor explained the rationale for the inference and tied it to the evidence, we conclude the remarks did not exceed the wide latitude afforded prosecutors in drawing inferences from the evidence. See *State v. Timley*, 311 Kan. 944, 952, 469 P.3d 54 (2020) (while prosecutor's argument tested the boundaries of a reasonable inference, the remarks did not constitute prosecutorial error where the prosecutor explained the logical basis for the inference and tied it to the evidence at trial).

The concurring opinion reasons that the prosecutor's argument relied not on the evidence in the case but instead on improper inference stacking. See *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017) (The State may draw reasonable inferences from the facts presented at trial but may not ask the jury to make a presumption based on another presumption.). But the concurrence appears to equate inference stacking with the State's reliance on two independent facts. See *State v. Netherland*, 305 Kan. 167, 179, 379 P.3d 1117 (2016) (multiple pieces of evidence supporting a single inference do not constitute inference stacking). The State put on evidence showing that Ray was a pastor and evidence showing that Ray's body was positioned as if on a cross. From those two facts, which did not rely on each other, the prosecutor reasonably inferred that the person or persons who killed Ray knew his identity. Thus, the prosecutor's argument does not constitute impermissible inference stacking. See *Banks*, 306 Kan. at 861 ("[W]hile it is impermissible for a case to rely upon the theory that presumption A leads to presumption B leads to presumption C leads to fact D, it is perfectly proper for the State's case to be grounded upon a theory that presumption A, presumption B, and presumption C all separately point to fact D.").

Finally, the prosecutor's comments about the killings being nonaccidental were proper. First, the prosecutors argued that the killings were not accidental, not that the law equates a nonaccidental killing with a premeditated killing. Second, the prosecutor never offered a legal definition of premeditation. And third, the prosecutor's argument was based on a reasonable inference from the evidence. Based on the condition, positioning, and location of the bodies, coupled with the torn clothing, all of which was depicted in the photographic and video evidence, it was reasonable to argue the deaths were not accidental—they were intentional and premeditated.

## F. Shields Fails to Establish Cumulative Error

Finally, Shields contends that the cumulative effect of the trial errors deprived him of his right to a fair trial. But neither the State nor district court committed any error besides the omission of the cautionary instruction on eyewitness identification. And we held that error was not reversible. A single, nonreversible error cannot establish cumulative error. See *State v. Ballou*, 310 Kan. 591, 616-17, 448 P.3d 479 (2019).

### CONCLUSION

The district court erred by failing to give the jury a cautionary instruction on eyewitness identification testimony. But its failure to provide this instruction to the jury does not warrant reversal of Shields' convictions because we are not firmly convinced that the instruction would have affected the verdict. We therefore affirm Shields' convictions for premeditated first-degree murder.

ROSEN, J., concurring:  I agree with the majority's outcome and most of its reasoning. I write separately because I would conclude that the prosecutor erred and crossed over the line when he opined to the jury that Shields arranged one of the victims' bodies in the shape of a crucifix and that this proved Shields knew the victim.

I acknowledge that prosecutors are permitted to "'craft arguments that include reasonable inferences to be drawn from the evidence.'" *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017) (quoting *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 [2010]). But, "while reasonable inferences may be drawn from the facts and conditions shown, they cannot be drawn from facts and conditions merely imagined or assumed." *State v. Burton*, 235 Kan. 472, 477, 681 P.2d 646 (1984). This is exactly what the prosecutor offered here—unreasonable and inflammatory inference stacking. There is no evidence that Shields knew the victims in this case. The prosecutor took a fanciful leap to get there by determining one of the bodies was found in a shape that resembled a crucifix, then speculating the killer purposefully arranged the body into that shape, and finally using this speculation in tandem with the fact the victim was a pastor to infer that the killer did this because he knew the victim.

The majority argues this is not inference stacking because the State's theory that the killer knew the victim rested on two independent facts—that the victim was a pastor and the body was "positioned" into the shape of a cross. I see no independent evidence that the body was purposefully arranged into the shape it was found. It may be reasonable to make this inference if one assumes the killer knew the victim, but this is, of course, the theory the State was trying to prove. That the State relies on a supported fact—the victim was a pastor—alongside the speculation that the body was purposefully manipulated to support its theory does not save this construction from being the impermissible inference

33

stacking that it is; the ultimate inference still depended on the unreasonable speculation that the body was staged. I would conclude the prosecutor stepped outside the wide latitude afforded the State when he advanced this theory. See *State v. Chandler*, 307 Kan. 657, 670, 414 P.3d 713 (2018) ("Presumptions and inferences may be drawn from established facts, but a presumption may not rest on presumption or inference on inference. In other words, an inference cannot be based on evidence that is too uncertain or speculative or that raises merely a conjecture or possibility.").

Ultimately, however, I agree with the majority's outcome on this issue because I believe the strength of the other evidence made this error a harmless one.