In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-2157

RONALD GAINES,

*Plaintiff-Appellant,*

*v.*

THOMAS J. DART, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-05192 — **Lindsay C. Jenkins**, *Judge.*

———————————

ARGUED FEBRUARY 25, 2025 — DECIDED OCTOBER 22, 2025

———————————

Before SYKES, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* At age 69, Ronald Gaines was fired by the Cook County Sheriff's Office. In response, Gaines sued his direct supervisor, Carmen Ruffin, in her individual capacity, and the Sheriff of Cook County, Thomas Dart, in his official capacity, alleging that they discriminated against him based on his age in violation of the Fourteenth Amendment, the Age Discrimination in Employment Act,

and the Illinois Human Rights Act. The district court granted summary judgment in favor of Ruffin and Sheriff Dart. We affirm.

**I**

We present the facts in the light most favorable to Gaines as the party opposing summary judgment. *Johnson v. Accenture LLP*, 142 F.4th 536, 540 (7th Cir. 2025).

Gaines joined the Cook County Sheriff's Office after retiring from a decades-long career with the Chicago Police Department. During the period relevant to this suit, Gaines served as Assistant Chief of the Electronic Monitoring (EM) Unit of the Community Corrections Division, which is responsible for monitoring individuals on pretrial release. As part of his responsibilities, Gaines was expected to complete daily reports of his activities and send those reports to his superiors. Gaines was also required to radio out his location regularly and be available to subordinate officers in the field as they followed leads and interfaced with individuals on pretrial release.

In 2019, Gaines reported to Carmen Ruffin, the Executive Director of the Community Corrections Division. Gaines, who was in his late 60s at the time, claims that Ruffin made several ageist comments to him during her time as his supervisor. During one conversation, Gaines claims that Ruffin called him into her office and asked why he did not just retire and collect his pension from the Chicago Police Department. In that same conversation, Ruffin expressed her desire to "build her own team" and "promote younger people." In another conversation, Ruffin commented that she was not sure how long certain officers over the age of 40 "would be

around," while in a third conversation she stated that she had done more in her last three months on the job than an older officer had in the past 24 or 25 years of their career.

Ruffin also criticized Gaines's work performance. She noted, for example, that Gaines failed to properly use the Unit's internal document and operations management software even after being trained on it several times.

Ruffin's issues with Gaines's performance came to a head in August 2019. On August 7, Ruffin sent Gaines an email memorializing a conversation the two had that day during which Ruffin reminded Gaines that it was his "responsibility to ensure the Investigators are completing their assignments in a timely manner" and that it was "not acceptable to ride around in areas … without communication with anyone … for hours on end."

Then, on August 13, Gaines signed into work at 7:45 in the morning, but Ruffin did not see him in the office or hear him on the radio between 8:30, when she arrived at the office, and shortly after noon, when she decided to look for him. When Ruffin was unable to find him, she asked Gaines's officemate, Lt. Lasharme Collins, where he was, but Collins did not know. Collins then radioed Gaines at Ruffin's request but did not get a response. Five or ten minutes later, Collins reached Gaines by phone. Gaines said that he was on his way back to the office.

Gaines returned to the office around 1:00 in the afternoon. Soon after Gaines returned, Ruffin confronted him about his whereabouts. Gaines told Ruffin that he had been at the doctor's office picking up medical records related to an on-duty injury and that he had been "available for his men if they

needed him." Ruffin admonished Gaines for his absence and for not following procedure, and said that he was "old enough to know better than to take care of personal business on company time." Later that day, Gaines requested two hours of sick leave for the time he spent away from his desk, which Ruffin denied. Gaines went on "Injury on Duty" status six days later, where he would ultimately remain until a doctor cleared him to return to work a year and a half later on March 10, 2021, two days before his employment was terminated.

We return, however, to the fallout from Gaines's absence on August 13, 2019. The next day, on August 14, Ruffin consulted her direct supervisor, Chief of Intergovernmental Affairs Adriana Morales, about Gaines's absence. Morales directed Ruffin to report the incident to the Sheriff's Office of Professional Review (OPR). In Ruffin's written complaint to OPR, she recounted the events of August 13, alleging that Gaines was not seen or heard from for hours despite signing in that morning. She also recounted that, when questioned, Gaines stated he went to a doctor's office, and he requested two hours of sick time to account for his absence. Ruffin added that Gaines had a history of inactivity while working and of being unable to account for his time, attaching her August 7 email and other correspondence as examples.

After receiving Ruffin's complaint, OPR launched an investigation. The assigned OPR investigator, Eyman Zabadneh, interviewed Ruffin, Collins, Deputy Chief Cedric Logan, and Unit Investigators Daniel Folkner and Richard Messina. Zabadneh also scheduled an October 2019 interview with Gaines, but Gaines never showed up and never responded to Zabadneh's subsequent attempts to contact him.

Zabadneh's interviews with Ruffin and Collins are most important for our review. During Zabadneh's interview with Ruffin, Ruffin stated that Gaines often failed to log his daily activities or radio his locations to subordinates. Ruffin voiced her belief that Gaines was visiting his boathouse "somewhere around 144th street in Riverdale Il [sic]" during work hours, and guessed that GPS data could show Gaines was there during his shift. During Zabadneh's interview with Collins, Collins reported that Gaines had gone to the doctor during work hours on August 13 "in full uniform" and using a "county vehicle."

In addition to conducting these interviews, Zabadneh reviewed Gaines's computer activity and work vehicle GPS data. Zabadneh's review found that Gaines's work vehicle was in the vicinity of "3 different boat houses during work hours on 5 different days." Zabadneh cross-referenced the addresses of these boathouses with EM Unit records and Gaines's work logs and found that none of the addresses were associated with any individual on electronic monitoring. Gaines also did not record in his work logs what work, if any, he conducted while at these addresses.

Zabadneh concluded his investigation over a year later on September 30, 2020. He found that Gaines "took advantage of his trusted official position as a supervisor and used it to conduct personal business during his shift, leaving investigators unsupervised on more than one occasion." In his report, Zabadneh credited the interviewees' descriptions of what happened on August 13, finding that Gaines left his post for two hours to visit the doctor "while in full uniform, driving a county vehicle without permission." Zabadneh also found that Gaines was not heard over radio and did not respond to

any radio calls during that time. Along with the GPS data, Za-badneh also found other evidence that Gaines was derelict in his duties, namely that Gaines had only logged one entry into the Unit's computer system and had no bodyworn camera footage from his time patrolling. Finally, Zabadneh noted that Gaines "was due to retire in November of 2019" and was currently on "Injury on Duty" status receiving benefits for an injury.

Per protocol, Zabadneh's report and recommendation were escalated to OPR's senior leadership. OPR's Director and Executive Director both approved Zabadneh's report. Morales, the Chief of Intergovernmental Affairs Ruffin had initially consulted before filing her written complaint, had the task of completing a final Command Channel Review of Zabadneh's investigation. As the ultimate decisionmaker, Morales reviewed the report and concluded that termination was appropriate. Gaines, who at this point was 69 years old, was terminated on March 12, 2021, two days after he returned from medical leave.

Gaines brought a lawsuit in federal court against Ruffin, Sheriff Dart, and Cook County, and filed charges with the EEOC on the same day. The district court stayed the court proceedings to allow the administrative process to conclude. After Gaines exhausted his administrative remedies, he moved to lift the stay and the lawsuit resumed.

During discovery, Gaines presented affidavits from six EM Unit officers over the age of 40 who reported to Ruffin and alleged that she made ageist comments and discriminated against older workers:

- Officer Walker, then 57 years old, stated that Ruffin asked him how long he was going to remain in the job and became "visibly upset" when Walker responded that he planned to remain on the force for several more years;
- Officer Jackson, then 60, stated that on Ruffin's second day as a new supervisor, she commented that "she didn't care for people who had over 25 years of experience or those with seniority." Ruffin also allegedly asked him "how many years [he] had until retirement";
- Officer Malone-Cole, then 50, heard Ruffin stating "what are these people doing here, what are we paying them to do here?" in reference to older officers in the unit;
- Officer Brown, then 58, alleged that Ruffin would make "inappropriate comments in reference to older officers retiring, such as "4 down, 5 more to go"; and
- Officers Logan and Clark (both age 62) alleged that Ruffin gave favorable work assignments to younger officers, with Logan alleging that several older officers retired "within a week" while under Ruffin's control.

Of the six officers, Officer Malone-Cole was terminated by Ruffin, and the remaining five each alleged that they elected to retire, some of them earlier than planned, because of Ruffin's comments and actions.

The district court granted summary judgment in favor of Ruffin and Sheriff Dart on each of Gaines's age discrimination claims. And because Gaines had only brought an indemnification claim against Cook County, the district court granted

summary judgment to Cook County as well. This appeal fol-
lowed.

## II

We review grants of summary judgment de novo.
*Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024).
Summary judgment is appropriate where "the movant shows
that there is no genuine dispute as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if
a reasonable juror could look at the evidence and return a ver-
dict for the non-moving party." *Kinney v. St. Mary's Health,
Inc.*, 76 F.4th 635, 642 (7th Cir. 2023).

Gaines brings his age discrimination claims under three
causes of action: violation of the Fourteenth Amendment by
way of 42 U.S.C. § 1983 against Ruffin, and violation of the
Age Discrimination in Employment Act (ADEA), 29 U.S.C.
§ 621 *et seq.*, and the Illinois Human Rights Act (IHRA), 775
ILCS 5/1-101 *et seq.*, against Sheriff Dart. We address each in
turn, concluding that Gaines fails to provide sufficient evi-
dence to support his claims.

### A.  Gaines's Fourteenth Amendment Claim

A plaintiff may bring an age discrimination claim by way
of 42 U.S.C. § 1983, which permits individuals to sue when
state and local officials violate their constitutional rights—
here, the Equal Protection Clause of the Fourteenth Amend-
ment. *Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021). To
survive summary judgment and proceed to trial, a plaintiff
must present evidence that: (1) "the defendant intentionally
treated him differently from others similarly situated"; (2)
"because of his membership in the class to which he

belonged"; and (3) "the difference in treatment was not rationally related to a legitimate state interest" *Id.* (citation modified).

Along with these elements, a plaintiff must also show that the age discrimination he experienced "caused the adverse employment action." *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). This means Gaines must present evidence that Ruffin "caused or participated in" his different treatment based on his age. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012). Dispositive here is Gaines's failure to present sufficient evidence to create a triable issue as to different treatment and causation.

### 1. *Insufficient Comparator*

A § 1983 plaintiff can demonstrate that the defendant treated him differently "either by statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently from him." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). Gaines has not presented statistical evidence and instead relies exclusively on his proposed comparators, who are the six officers whose affidavits we described earlier.

Assuming without deciding that the officers' affidavits are sufficient to show that Ruffin harbored discriminatory animus, the six officers do not qualify as comparators under our caselaw. A suitable comparator is someone similarly situated who Gaines can show was "intentionally treated [] *differently* from" him because of his age. *Reinebold*, 18 F.4th at 925 (emphasis added). Gaines does the opposite, presenting individuals who he explains were all affected by Ruffin's ageism just

as he was. Without a qualifying comparator, his Fourteenth Amendment claim cannot survive summary judgment.

### 2. *Causation*

Gaines encounters a similar setback in his effort to show a triable issue of fact on whether the discrimination he experienced caused his termination. Because Morales, not Ruffin, was the ultimate decisionmaker for his termination, Gaines presses a cat's paw theory of proximate causation that Ruffin's discriminatory animus can be imputed to Morales. The cat's paw theory applies when "a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action" and imposes liability "where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014) (citing *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012)); *see also Taylor v. Ways*, 999 F.3d 478, 488–89 (7th Cir. 2021) (permitting cat's paw causation arguments in § 1983 cases).

For Gaines's cat's paw theory to survive summary judgment, he must present evidence that "the biased subordinate actually harbored discriminatory animus" and that the "subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (citation modified). Proximate cause is established where "the investigation took the [biased supervisor's] complaint 'into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified' or if the investigation 'relies on facts provided by the biased supervisor.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d

456, 462 (7th Cir. 2021) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)). Put more simply, a cat's paw theory *cannot* be credited if "the employer believed it had independently sufficient reasons, such as corroboration of the allegations, to take the adverse action." *Id.*

Gaines has presented substantial evidence that Ruffin harbored discriminatory animus against older workers and incited the investigation into Gaines's conduct. But his cat's paw theory fails because he has not presented sufficient evidence that Ruffin's involvement in the OPR investigation tainted its findings such that her animus proximately caused Morales's termination decision.

Take the OPR investigation first. Even setting aside Ruffin's statements to Zabadneh during her interview, Zabadneh's final report shows that he uncovered several lawful grounds for firing Gaines independent of any statement by Ruffin. These grounds included: (1) Collins's statement corroborating Ruffin's allegation that Gaines was missing and unreachable for hours on August 13; (2) Gaines's admission that he conducted personal business during duty hours;[1] (3) Collins's statement that Gaines offered to put in medical time for the hours he was gone on August 13; (4) Collins's statement that Gaines was in uniform and used a county vehicle while at the doctor's office on August 13; (5) data entry records showing that Gaines had made only one work entry in the county system; and (6) the lack of any bodyworn camera

---

[1] Gaines's counsel attempts to argue the contrary on appeal by noting that the GPS data Zabadneh reviewed did not contain any records for August 13, 2019. The lack of GPS data does not create a triable fact as to Gaines's conduct on August 13 given his admission that he was at the doctor without securing leave to be there.

footage establishing that Gaines went on patrol while working for the EM Unit. Presented with this evidence, no reasonable jury reviewing Zabadneh's report could conclude that it was so infected by discriminatory animus that it did not provide "independently sufficient reasons" for terminating Gaines. *Vesey*, 999 F.3d at 462.

To cast doubt on the validity of Zabadneh's report, Gaines disputes Zabadneh's conclusion that he inappropriately visited several boathouses while on duty and the GPS data underlying that conclusion. To that end, Gaines contends that Zabadneh's conclusion was based exclusively on Ruffin's discriminatory influence rather than actual facts because Ruffin tipped Zabadneh off about Gaines's unauthorized trips to his boathouse. Gaines then cites to certain portions of the appendix to Zabadneh's report which contain a map and a disaggregated list of Gaines's vehicle GPS data. He argues that these records are meaningless because they are not granular enough to support Zabadneh's investigative findings and because the locations Gaines visited are not where Ruffin claimed they would be. The record does not support Gaines's argument. Instead of blindly relying on the GPS data as Gaines maintains, Zabadneh cross-referenced the addresses against the known locations of individuals on pretrial release and against work logs to reasonably conclude that Gaines had no legitimate reason to be at those addresses while on duty. Zabadneh's conclusion, therefore, is supported regardless of Ruffin's influence or whether the relevant addresses were actually boathouses or registered to Gaines.

Gaines attempts to inject doubt into Zabadneh's cross-referencing of the addresses by pointing out that, at his deposition, Zabadneh was unable to identify which locations in the

GPS records did not belong to individuals on pretrial release. But Zabadneh's inability to recall the specific addresses in the report at a deposition two years later has little bearing on whether he actually conducted the cross-reference. And Gaines does not respond to or present any evidence refuting Zabadneh's other deposition testimony showing that he undertook the crucial investigative step of cross-referencing the addresses.

The same result applies to Gaines's argument that Ruffin's discriminatory animus unlawfully influenced Morales's decision. Our cases concerning the cat's paw theory regularly repeat that the ultimate decisionmaker need not be "a paragon of independence." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (quoting *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009)). Rather, all that is required is "that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009), *rev'd and remanded on other grounds*, 562 U.S. 411 (2011).

Gaines argues that Morales's review was not independent for two reasons. First, he charges that Morales was unjustified in relying on the "sham" OPR investigation findings. Gaines compares this case to *Vega v. Chicago Park District*, 954 F.3d 996 (7th Cir. 2020), where this court held that a jury "could have easily concluded that [the supervisor's] review was too superficial to constitute a meaningful and independent investigation." *Id.* at 1007. But *Vega* is inapposite. There, the court did not make its independence finding merely because the supervisor's review of the investigative report was brief, but also because the investigation was conducted "in violation of [the

employer's] commitments under its union agreement, [where the investigator] neither consulted with [the plaintiff's] then-supervisor nor recommended any progressive discipline." *Id.* at 1003. There is no similar evidence in Gaines's case. And as already discussed, the record shows that Zabadneh's investigation uncovered several legitimate grounds for Gaines's termination untainted by Ruffin's animus. There is no triable issue about whether Morales "drew a conclusion independent of any alleged influence by [Ruffin]." *Sinha*, 995 F.3d at 575.

Second, Gaines argues that Morales's failure to speak with or interview him means that her decision could not have been independently made. Even setting aside the fact that Gaines failed to cooperate with his employer's investigation, our caselaw makes this argument a non-starter: we have long affirmed the ability of supervisors to rely on others' investigative findings when making employment decisions. *See Staub*, 560 F.3d at 659.

For these reasons, Gaines has failed to present sufficient facts supporting a finding of proximate causation under a cat's paw theory of liability. The undisputed record establishes that OPR's investigation and Morales's independent review "broke [any] causal chain" that might have extended from Ruffin's discriminatory animus. *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015).

### B.  Gaines's ADEA & IHRA Claims

We turn to Gaines's remaining claims under the ADEA and the IHRA. Because the claims are evaluated the same way in federal court, we discuss them together. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013) (citing *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill.

1989)). The ADEA makes it unlawful for employers to "discharge … or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff must not only prove that his age caused his adverse employment outcome, but also that "but for his age, the adverse action would not have occurred." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (citation modified).

Gaines presents his claims under both the *McDonnell Douglas* burden-shifting framework and the *Ortiz* holistic approach. We apply each and conclude that Gaines's claims fail under both.

### 1.   *The McDonnell Douglas Framework*

Under the *McDonnell Douglas* framework, "a plaintiff must first establish a prima facie case for discrimination" by presenting evidence that: (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) other similarly situated individuals who were not members of a protected class received more favorable treatment. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Gaines's claims fail to make out a prima facie case because he has not presented evidence that he met his employer's expectations or identified a sufficiently similar comparator.

First, the employer's expectations. The OPR report's findings establish that Gaines was not meeting the Sheriff's Office's reasonable expectations. Even excising any findings based solely on Ruffin's comments to Zabadneh, the

remainder of the record establishes that Gaines conducted personal business during duty hours on August 13 and engaged in little, if any, EM Unit work that morning. Gaines does not dispute these allegations or allege that his employer did not actually expect him to remain at his post, document his daily activities, and aid officers in the field.

Second, the proposed comparators. Gaines rightly points out that the district court erroneously required him to present ADEA comparators who were under 40 years old. That is a requirement in the § 1983 context, not for the ADEA. ADEA plaintiffs need only present "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion …." *O'Connor v. Cons. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996) (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)). For age discrimination claims, this means that plaintiffs may present comparators who are over 40, so long as those comparators are not "insignificantly younger" than the plaintiff. *Id*. In practice, this has meant that age gaps as small as eight years have been sufficient to plead a prima facie case. *See Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).

Nevertheless, the district court's error made no difference because, for the reasons discussed above in Part II.A.1 of this opinion, Gaines does not present comparators who were treated differently than him. Accordingly, his claim fails under the *McDonnell Douglas* framework.

### 2.  *Ortiz*

Under *Ortiz*, "we look at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Vichio*, 88 F.4th at 691 (citing *Ortiz v. Werner*

*Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (explaining that under this test, we consider all of the evidence "in a single pile" and evaluate it "as a whole")).

Gaines presents the following as circumstantial evidence that his termination was motivated by his age: (1) Ruffin's discriminatory animus, as demonstrated by her age-related comments to and about Gaines and other officers, and her involvement in the OPR investigation; (2) the suspicious timing of Ruffin's complaint to OPR relative to her comment a day earlier that Gaines was "old enough to know better"; (3) Zabadneh's reference to Gaines's retirement age in the investigative report; and (4) the discrepancy between Ruffin's OPR complaint, which only stated that Gaines was derelict on August 13, 2019, and the ultimate grounds for his termination which included Gaines's other on-duty absences.

As for the evidence of Ruffin's discriminatory animus, Ruffin was neither the ultimate decisionmaker nor the proximate cause of Gaines's termination. So, as we explained earlier, this animus cannot support Gaines's age-discrimination claim. *See supra,* Part II.A.2; *see also Brooks v. Avancez*, 39 F.4th 424, 439 (7th Cir. 2022) (noting discriminatory remarks "can raise an inference of discrimination if they are made by a person with decision-making power over the adverse employment action at issue"); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016) ("Remarks can raise an inference of discrimination when they are '(1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" (quoting *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010))).

As for suspicious timing, even assuming that Ruffin's comment was suspiciously timed with her complaint to OPR, the complete evidentiary picture does not present a triable issue of age discrimination. As discussed above, the record establishes that Zabadneh independently investigated Ruffin's claims and credibly found that Gaines was not only unreachable for hours on August 13 but also logged almost no work based on his computer system entries and bodyworn camera. The record also shows that Zabadneh's findings were subject to evaluation by two OPR directors before Morales. This independence precludes a finding in Gaines's favor.

Next, Gaines's argument about Zabadneh's reference to his retirement age is speculative. Even assuming that Zabadneh took Gaines's retirement into account when conducting the investigation, Zabadneh did not link Gaines's age to his investigative findings and supported the report's conclusions with evidence from interviews and employment records. The fleeting reference to Gaines's retirement is not sufficient, even when considered alongside the remainder of the record, to bind the report to Ruffin's animus.

Finally, there is the discrepancy between Ruffin's initial complaint to OPR and Zabadneh's final report. That Zabadneh's investigation uncovered other grounds for termination does not suggest that the report was motivated by discriminatory animus. Plus, the bottom line remains: "[E]ven where a plaintiff in a discrimination case alleges that the company's investigation was imprudent, ill-informed and inaccurate, summary judgment is appropriate unless the employee could point to facts suggesting that the company investigated him differently because he was an older employee." *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) (citation

modified). Gaines has not pointed to any such facts here. The circumstantial evidence Gaines relies on, even when viewed as a whole or in a single pile, does not create a triable issue on whether age motivated Morales's decision to terminate Gaines.

*      *      *

For these reasons, the judgment of the district court is AFFIRMED.